

FILED
JAN 1 4 2020
Mark C. McCartt, Clerk
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. _____ |
| | ) | **20 CR 004 GKF** |
| Plaintiff, | ) | **INDICTMENT** |
| | ) | [COUNTS 1 and 2: 18 U.S.C. § 1341 – |
| v. | ) | Mail Fraud; |
| | ) | COUNTS 3 through 15: 18 U.S.C. § |
| ELISA KAYE SANDERS, | ) | 1343 – Wire Fraud; |
| | ) | Forfeiture Allegation: 18 U.S.C. § |
| Defendant. | ) | 981(a)(1)(c) and 28 U.S.C. § 2461 – |
| | ) | Wire and Mail Fraud Forfeiture] |

**THE GRAND JURY CHARGES:**

The Scheme

From at least in or about November of 2012, a more exact date being unknown to the Grand Jury, to on or about April 1, 2018, in the Northern District of Oklahoma and elsewhere, the defendant, **ELISA KAYE SANDERS**, knowingly devised, and intended to devise, a scheme and artifice to defraud clients seeking treatment from a spa owned in part, and operated by, **SANDERS**, staff associated with her spa, and the state and federal regulatory agencies responsible for the oversight of her spa's activities; and to obtain money from her spa's clients by means of materially false and fraudulent pretenses, representations, and promises; and by intentional concealment and omissions of material facts, as described below ("the Scheme"):

The Purpose of the Scheme

1. The purpose of the Scheme was to enrich **SANDERS** by obtaining money from clients; to use those funds to operate her spa; to support **SANDERS'** lifestyle; and to conceal from the clients, staff associated with the spa, and the federal and state regulatory

agencies responsible for the oversight of the spa's activities, the truth about the source and prescribing of prescription drugs and devices offered by **SANDERS**.

## The Manner and Means of the Scheme

2. In 1980, **SANDERS** obtained her nursing license. However, in September of 2016, **SANDERS** lost her nursing license and, as part of the Scheme, did not advise her clients that she no longer had a nursing license.

3. It was part of the scheme that, in 2011, **SANDERS** was the majority owner of Enhance Skin and Body Medical Spa ("Enhance"). In 2017 Enhance was renamed L'Chaim Medical Spa ("L'Chaim")(collectively "Spa"). The Spa was located at 6616 South Memorial Boulevard, Tulsa, Oklahoma, in the Northern District of Oklahoma.

4. It was part of the Scheme that, beginning in 2011, **SANDERS** treated clients at the Spa with prescription drugs and devices to enhance facial features.

    a. **SANDERS** offered Botox® Cosmetic, which is a prescription drug used for the treatment of glabellar lines, commonly referred to as wrinkles. The dispensing of Botox® Cosmetic requires supervision by a licensed practitioner.

    b,. **SANDERS** also offered Juvederm® and other fillers at the Spa. Several Juvederm® applications have been approved by the United States Food and Drug Administration ("FDA") in the United States, if used under the supervision of a licensed practitioner. However, Juvederm® Ultra 3 and Juvederm® Ultra 4 are not approved by the FDA for distribution and use in the United States.

5. It was part of the Scheme that **SANDERS** participated in and oversaw the Spa's purchase, receipt, holding, and administration of drugs and treatment articles used for the treatment of clients, including prescription drugs and devices such as Botox® Cosmetic and Juvederm®.

6. It was part of the Scheme that the Spa would hire various licensed physicians to supervise the administration of prescription drugs and devices at the Spa to appear legitimate. During the dates alleged, however, in fact **SANDERS** administered and directed the administration of Botox® Cosmetic and Juvederm® to clients with little to no supervision by a licensed practitioner.

7. It was part of the Scheme that **SANDERS** obtained Botox® Cosmetic and Juvederm® Ultra 3 and 4 from unauthorized sources who diverted it from the legitimate prescription drug supply chain.

    a. In or about 2014, **SANDERS** obtained Botox® Cosmetic directly from a source in India, who purported to sell **SANDERS** Botox® Cosmetic for personal use, when in fact, **SANDERS** obtained the drugs for use on clients at Spa.

    b. From in about November of 2012 to in or about April of 2018, **SANDERS** ordered Botox® Cosmetic and Juvederm® Ultra 3 and 4 from Medica Depot, Meds4Less, and other unauthorized sources of prescription drugs and devices. **SANDERS** continued to purchase some of its Botox® Cosmetic from authorized sources.

    c. In or about September of 2016, FDA Representatives visited the Spa and advised **SANDERS** that purchasing prescription drugs and devices from

unauthorized sources was illegal. **SANDERS** advised Spa staff that they could not continue to purchase prescription drugs and devices from their unauthorized sources. Soon afterwards, and in an effort to conceal the purchases, **SANDERS** caused Botox® Cosmetic to be shipped from an unauthorized source to a local business not associated with the Spa, where **SANDERS** would pick up or cause to be picked up, the Botox® Cosmetic from an unauthorized source for use on clients at the Spa.

d.  From in or about October of 2016 to on or about May 15, 2018, **SANDERS** sold approximately 30,631 units of Botox® Cosmetic from various suppliers. Approximately 3,000 of those units were purchased from authorized sources.

8.  It was part of the Scheme that **SANDERS** obtained Juvederm® Ultra 3 and 4. Juvederm® Ultra 3 and 4 have not been approved by the FDA for use in the United States, and were not properly exempt from approval for a clinical investigation. **SANDERS** purchased Juvederm® Ultra 3 and 4 from unauthorized sources for use on clients.

9.  It was part of the Scheme that **SANDERS** obtained Botox® Cosmetic and Juvederm® Ultra 3 and 4 at a lower cost by purchasing them from unauthorized sources. **SANDERS** did not advise the clients of the source of the prescription drugs and devices. Some patients suffered adverse effects from **SANDERS'** administration of Botox® Cosmetic and Juvederm® Ultra 3 and 4.

10. It was part of the Scheme that, in promoting and explaining the Spa's purpose and in the treatment of the clients, **SANDERS** did not provide them with material information, including the following:

   a. **SANDERS** had lost her nursing license;

   b. The administration of prescription drugs and devices to the Spa's clients was not properly supervised by physicians;

   c. **SANDERS**'s administration of prescription drugs and devices was not safe and legal; and

   d. **SANDERS** obtained drugs from unauthorized sources.

11. It was part of the Scheme that **SANDERS** fraudulently failed to provide clients, staff associated with the Spa, and federal and state regulatory agencies responsible for the oversight of the Spa's activities, with the information set forth in paragraph 10 above, well knowing that it was material to the decisions they might make in regard to dealing with the Spa.

12. It was part of the Scheme that **SANDERS** fraudulently protected and concealed the Scheme by means of materially false and fraudulent pretenses, representations, and promises that lulled clients, staff associated with the Spa, and federal and state regulatory agencies responsible for the oversight of the Spa's activities, by ordering prescription drugs and devices partially from the authorized source of Botox® Cosmetic and partially from unauthorized sources for use on clients. **SANDERS** also purchased Juvederm® Ultra 3 and 4, which had not been approved for use in the United States, for use on clients.

13. It was part of the Scheme that **SANDERS** maintained bank accounts for the benefit of and in the name of the Spa, for the purpose of receiving payments from the clients, and for the purpose of disbursing those fraudulently obtained funds to **SANDERS**, to physicians, and staff associated with the Spa, and to vendors who provided goods and services to the Spa, for the operation of the Spa.

14. It was part of the Scheme that **SANDERS** fraudulently enriched herself and the Spa with money fraudulently obtained from clients totaling more than $250,000.

15. It was also part of the Scheme that **SANDERS** concealed her purchases and use of Botox® Cosmetic and Juvederm® Ultra 3 and 4 from unauthorized sources from Spa staff and regulatory agencies, including:

   a. by having the products shipped off-site from the Spa;

   b. by purchasing a small portion of the drugs and devices from authorized sources; and

   c. by causing altered and false medical records to be sent to a physician, who was treating a Spa client, to hide the true nature of the treatments administered upon the client by the Spa.

## COUNT ONE
### [18 U.S.C. § 1341]

16. The Grand Jury re-alleges and incorporates by reference Paragraphs 1 through 15 of this Indictment as if fully set forth herein.

17. On or about January 14, 2015, from the Northern District of Oklahoma and elsewhere, **SANDERS**, for the purpose of executing the Scheme and attempting so to do, knowingly caused to be deposited and to be sent and delivered by a private and commercial interstate carrier according to the directions thereon, the following matter: Botox® Cosmetic which was shipped from Mumbai, India, for purported personal use by **SANDERS** and which was not authorized for use in the United States, and which **SANDERS** actually intended to use on clients at the Spa.

All in violation of Title 18, United States Code, Section 1341.

## COUNT TWO
## [18 U.S.C. § 1341]

18. The Grand Jury re-alleges and incorporates by reference Paragraphs 1 through 15 of this Indictment as if fully set forth herein.

19. On or about September 21, 2017, from the Northern District of Oklahoma and elsewhere, **SANDERS**, for the purpose of executing the Scheme and attempting so to do, knowingly caused to be delivered by United States mail according to the directions thereon, the following matter relating to a client of the Spa known to the Grand Jury and designated herein as B.L.: a copy of B.L.'s medical records which was sent to B.L's doctor and altered to reflect that Juvederm® Ultra Plus XC had been administered to B.L., when in fact Juvederm® Ultra 4, a prescription device which had not been approved by FDA, had been administered to B.L., as **SANDERS** well knew.

All in violation of Title 18, United States Code, Section 1341.

# COUNTS THREE THROUGH TEN
# [18 U.S.C. § 1343]

20. The Grand Jury re-alleges and incorporates by reference Paragraphs 1 through 15 of this Indictment as if fully set forth herein.

## The Wire Communications

21. On or about the dates stated below, from the Northern District of Oklahoma and elsewhere, **SANDERS**, for the purpose of executing the Scheme and attempting so to do, caused writings, signs, signals, pictures, and sounds to be transmitted by means of wire communication in interstate commerce. The wire communication related to payment to the Spa made by clients known to the Grand Jury and designated by their initials below, for services as designated below, in amounts as approximately stated below:

| Count | Date | Client | Drug or Device | Wire Communication |
|---|---|---|---|---|
| 3 | 2/10/15 | A.P. | Botox 30 uts C3570 C3 | Visa Transaction - $157.50 |
| 4 | 7/8/15 | B.O. | Juvederm Ultra 3 | Mastercard Transaction - $1000 |
| 5 | 2/15/16 | V.W. | Botox 30 uts C3845 C3 | Visa Transaction - $100 |
| 6 | 5/31/16 | R.B. | Botox 36 uts C40 88C3 | Visa Transaction - $500.72 |
| 7 | 7/22/16 | R.S. | Botox 34 uts C3899 C3 | Visa Transaction - $339.66 |
| 8 | 8/24/16 | J.D. | Botox 44 uts C4025 C3 | Mastercard Transaction - $439.56 |
| 9 | 11/1/16 | T.S. | Juvederm Ultra 4 | Visa Transaction - $1400 |
| 10 | 5/22/17 | L.M. | Juvederm Ultra 4 | Care Credit Transaction - $1212 |

All in violation of Title 18, United States Code, Section 1343.

# COUNTS ELEVEN THROUGH FIFTEEN
## [18 U.S.C. § 1343]

22. The Grand Jury re-alleges and incorporates by reference Paragraphs 1 through 15 of this Indictment as if fully set forth herein.

23. On or about the dates stated below, from the Northern District of Oklahoma and elsewhere, **SANDERS**, for the purpose of executing the Scheme and attempting so to do, caused writings, signs, signals, pictures, and sounds to be transmitted by means of wire communication in interstate commerce. The wire communications related to payment to Global Health by an individual known by the Grand Jury and designated herein as C.M., who was directed by **SANDERS** to purchase Botox® Cosmetic and who reimbursed C.M. for the purchase of Botox® Cosmetic received from unauthorized sources for administration to clients, in amounts as approximately stated below:

| Count | Date of Payment to Global Health by C.M. | Amount | Financial Institution and Account |
|---|---|---|---|
| 11 | 10/8/16 | $3200 | Oklahoma Central Credit Union xxxxxxx210 |
| 12 | 10/20/16 | $1850 | Oklahoma Central Credit Union xxxxxxx210 |
| 13 | 10/27/16 | $2950 | Oklahoma Central Credit Union xxxxxxx210 |
| 14 | 11/3/16 | $1850 | Oklahoma Central Credit Union xxxxxxx210 |
| 15 | 11/11/16 | $3545 | Oklahoma Central Credit Union xxxxxxx210 |

All in violation of Title 18, United States Code, Section 1343.

# FORFEITURE ALLEGATION
## [18 U.S.C. § 981(a)(1)(c) and 28 U.S.C. § 2461]

The allegations contained in this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 981(a)(1)(c) and Title 28, United States Code, Section 2461.

Upon conviction of the offenses alleged in this Indictment, as a part of her sentence, the defendant, **ELISA KAYE SANDERS**, shall forfeit to the United States any property constituting, or derived from, or traceable to, the proceeds obtained, directly or indirectly, as a result of such violations. The property to be forfeited includes, but is not limited to:

**MONEY JUDGMENT**

A money judgment in an amount of at least $250,000, representing proceeds obtained by the Defendant as a result of the offenses;

Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Sections 982(b)(1) and 1028(g), and Title 28, United States Code, Section 2461(c), the defendant shall forfeit substitute property, up to the value of the property described above if, by any act or omission of the defendant, the property described above, or any portion thereof, cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third party; has been placed beyond the jurisdiction of the court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty.

All in violation of Title 18, United States Code, Section 981(a)(1)(c) and Title 28, United States Code, Section 2461.

R. TRENT SHORES
UNITED STATES ATTORNEY

A TRUE BILL

*/s/ Shannon Cozzoni*
SHANNON COZZONI
Assistant United States Attorney

*/s/ Grand Jury Foreperson*
Grand Jury Foreperson