IN THE UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | No. 20-CR-004-GKF |
| | ) | |
| ELISA KAYE SANDERS, | ) | |
| | ) | |
| Defendant. | ) | |

TRANSCRIPT OF MOTION HEARING

**BEFORE THE HONORABLE GREGORY K. FRIZZELL**

**UNITED STATES DISTRICT JUDGE**

JUNE 9, 2020

A P P E A R A N C E S

**Shannon Cozzoni and Scott Proctor,** Assistant U.S.
Attorneys, 110 West Seventh Street, Suite 300, Tulsa, Oklahoma,
74119, attorneys on behalf of the Plaintiff;

**Mark D. Lyons and Martha Blackburn,** Attorneys at Law,
Lyons & Clark, 616 South Main Street, Suite 201, Tulsa,
Oklahoma, 74119, attorneys on behalf of the Defendant.

*REPORTED BY:*        *BRIAN P. NEIL, RMR-CRR*
                      *United States Court Reporter*

1                        *I  N  D  E  X*

2

3                         *WITNESSES*

4                                                    *PAGE*

5    JEREMY BAIN
        Direct Examination by Mr. Proctor              19
6        Cross-Examination by Mr. Lyons                81

7    JOSEPH MCCULLEY
        Direct Examination by Mr. Lyons               30
8        Cross-Examination by Mr. Proctor             57

9    TODD BLAIR
        Direct Examination by Mr. Lyons               60
10       Cross-Examination by Mr. Proctor             66

11   DANIEL ALLGEYER
        Direct Examination by Mr. Lyons               69
12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          Tuesday, June 9, 2020

2                    *  *  *  *  *

3          **DEPUTY COURT CLERK:**  This is Case No. 20-CR-004-GKF,

4    United States of America v. Elisa Kaye Sanders.  Counsel,

5    please state your appearances for the record.

6          **MS. COZZONI:**  Shannon Cozzoni and Scott Proctor for

7    the United States, and at table is Jeremy Bain from the FDA,

8    the agent.

9          **THE COURT:**  Good afternoon.

10         **MR. LYONS:**  May I unmask?

11         **THE COURT:**  You may.

12         **MR. LYONS:**  Mark Lyons and Martha Blackburn here for

13   Ms. Sanders.  I also have Ms. Sanders and also have a law

14   clerk, R.J. Seaver, third-year law student, TU.

15         **THE COURT:**  Terrific.  Good afternoon.

16         We have at least four matters to deal with here this

17   afternoon.  The first, as I understand, is the defendant has

18   not been arraigned on the superseding indictment; correct?

19         **MS. COZZONI:**  That's correct.

20         **THE COURT:**  All right.  I think I can handle that.

21         Let me ask:  We tried to compare the indictment with

22   the superseding indictment and it appears that the superseding

23   merely makes technical corrections; correct?

24         **MS. COZZONI:**  There is one correction.  I think it's

25   -- let me double-check by count.  Count 5 changed from $100 to

1    $80; that's it.

2          THE COURT:  That's all we saw.  So this is the

3    easiest of the four matters we have to deal with this

4    afternoon.  Ms. Sanders, if you'll approach the podium to be

5    sworn, please.

6          DEPUTY COURT CLERK:  Please raise your right hand.

7    Do you solemnly swear the testimony you will give in the matter

8    pending before this court will be the truth, the whole truth,

9    and nothing but the truth, so help you God?

10          THE DEFENDANT:  Yes, ma'am.

11          THE COURT:  Good afternoon.  What's your full name?

12          THE DEFENDANT:  Elisa Kaye Sanders.

13          THE COURT:  How old are you?

14          THE DEFENDANT:  Sixty-one.

15          THE COURT:  How far did you go in school?

16          THE DEFENDANT:  I have an associate's degree in

17    nursing, and I don't know how many hours -- about 24 hours

18    towards a bachelor in medical administration.

19          THE COURT:  All right.  What is your employment

20    experience?

21          THE DEFENDANT:  Started at, golly, Grand Valley

22    Hospital in Pryor, Oklahoma; Hillcrest Hospital in Tulsa,

23    Oklahoma; went to home health in Midwest City; and here in

24    Tulsa to -- good grief -- Oklahoma Nursing Home Supply to SS

25    Medical to Saint Francis and St. John's Home Health -- or Home

1  Medical to Metro Medical to Enhance, which changed its name to
2  L'Chaim.

3        THE COURT:  Are you currently, or have you recently
4  been, under the care of a physician or a psychiatrist or been
5  hospitalized or treated for narcotics addiction?

6        THE DEFENDANT:  No.

7        THE COURT:  Have you taken any drugs, medicine, or
8  pills, or drunk any alcoholic beverage in the past 24 hours?

9        THE DEFENDANT:  I took a sleeper every night.

10        THE COURT:  All right.

11        THE DEFENDANT:  And I'm under care for that.

12        THE COURT:  I'm sorry?

13        THE DEFENDANT:  And I am under a doctor's care for
14  that.

15        THE COURT:  All right.  Have you received a copy of
16  the superseding indictment?

17        THE DEFENDANT:  Yes, sir.

18        THE COURT:  And have you had time to consult with
19  Mr. Lyons about that superseding indictment?

20        THE DEFENDANT:  Yes, sir.

21        THE COURT:  Have you read it in full, the
22  superseding indictment?

23        THE DEFENDANT:  Yes, sir.

24        THE COURT:  All right.  And then you've seen the
25  slight change from $100 to $80 in Count 5; right?

1    THE DEFENDANT:  Yes, sir.

2    THE COURT:  All right.  Will your client waive the

3    formal reading of the superseding indictment at this time?

4    MR. LYONS:  Yes, she will, Your Honor.

5    THE COURT:  All right.  And how do you plead to the

6    charges contained in the superseding indictment?

7    THE DEFENDANT:  Not guilty, sir.

8    THE COURT:  Very well.  Thank you.  You may be

9    seated.

10    The second matter relates to a telephone call that I

11    had with counsel regarding the setting of the trial in this

12    matter.  As you all know, general order 20-13, which was

13    entered on May 28th, continues all criminal hearings and trials

14    pending before any district judge that is currently scheduled

15    on or before June 30th, 2020.  And in the telephone call, that

16    I had with all counsel to this matter, we agreed that this

17    matter would be continued to the July setting.

18    The considerations are primarily practical.  Even if we

19    space jurors in a criminal trial out horizontally, it's very

20    difficult to space them vertically to get the necessary spacing

21    so we would have to set some chairs in front of the jury box.

22    Even then, we would only be able to get six or seven in this

23    area and then we'd have to space the other jurors out on the

24    front bench behind the attorneys.

25    So with the hope that things might change by July, and

1    even if they don't, we'll then start trying jury trials in

2    criminal matters with that necessary spacing.  But I wanted to

3    state that for the record and continue this matter to the July

4    trial docket.

5           Karen, what date is that in July?

6               **DEPUTY COURT CLERK:**  It's July 20th.

7               **THE COURT:**  July 20.  Is there any objection to

8    anything that the court has said with regard to scheduling?

9               **MS. COZZONI:**  No, Your Honor.  The one thing I will

10   tell you is we have one witness coming from California on the

11   interstate nexus that may have some issues with what's going on

12   out there, but we don't have enough information really at this

13   time to know if that's going to be an issue, July, and we'll

14   discuss with Mr. Lyons on that.

15              **THE COURT:**  California has actually had a pretty

16   good track record.

17              **MS. COZZONI:**  They've still been quarantined

18   apparently in -- like I said, we've got preliminary

19   information.  Just kind of wanted to let you know there is --

20   it's a -- it's the Visa representative who would say that Visa

21   wires cross interstate commerce.  So it may very well be

22   something we can talk about and handle altogether, it may be

23   they can travel.  It's not -- but I just want to be frank with

24   the court and let you know what's going on.

25              **THE COURT:**  Well, will Gavin Newsom pay any

1   attention to federal court orders?

2           **MS. COZZONI:** I'm not sure.

3           **THE COURT:** Nor I. Mr. Lyons.

4           **MR. LYONS:** I don't have any objections to what

5   you've stated so far. If the only purpose for that witness is

6   to say that Visa charging connections travel through interstate

7   wires, I betcha we can work something out without having to

8   bring a witness.

9           **THE COURT:** Terrific. All right. And any objection

10  to the facts as I've related to them relative to the setting of

11  the trial docket?

12          **MR. LYONS:** No, sir. I mean, you've set us

13  nominally for July 20th. But how many cases are there? We're

14  one of how many cases?

15          **THE COURT:** I don't know. Karen, any idea?

16          **MR. LYONS:** Because I imagine you're kind of backed

17  up, aren't you?

18          **THE COURT:** We are. Although people are getting

19  back -- we've taken a lot of pleas here in the last two weeks.

20          **DEPUTY COURT CLERK:** Currently, we have three other

21  criminal cases and one civil.

22          **THE COURT:** All right. And where does this fall in

23  terms of filing date?

24          **DEPUTY COURT CLERK:** This would be -- this would be

25  first.

1          THE COURT:  This would be first?

2          DEPUTY COURT CLERK:  Correct.

3          THE COURT:  All right.  You're first up.

4          MR. LYONS:  Okay.

5          THE COURT:  All right.  So plan on going to trial in

6   July.

7          Under the Speedy Trial Act, it's the court's position,

8   as stated in general order 20-13, that all dates between

9   June 1st, 2020, inclusive through the scheduled July trial

10  docket starting July 20 of 2020, will be excluded under the

11  Speedy Trial Act, as the court and all of its judges who signed

12  the general order specifically found that the ends of justice

13  served by ordering the continuances outweigh the best interest

14  of the public and any defendant's right to a speedy trial

15  pursuant to Title 18 United States Code Section 3161(h)(7)(A).

16  I believe that satisfied the requirements of the Speedy Trial

17  Act.

18         Any dissension there?

19         MS. COZZONI:  No, Your Honor.

20         MR. LYONS:  No, Your Honor.

21         THE COURT:  Very good.  And let me just ask

22  specifically then to use belt and suspenders:  Any objection

23  from either party as to the continuance of the trial from the

24  June to the July trial docket?

25         MR. LYONS:  None from the defendant, Your Honor.

1    **MS. COZZONI:** Not from the United States.

2    **THE COURT:** All right. The third motion -- or the

3    third matter I'd like to address is the motion in limine to

4    prohibit any testimony about the contents of information on

5    vials of BOTOX or JUVÉDERM unless the government complies with

6    the best evidence rule and produces the actual items whose

7    contents are at issue. That motion is found at docket No. 33.

8         The court by minute order alerted counsel that I had a

9    number of questions for both parties, and counsel can present

10   any brief arguments they would like to make with regard to that

11   motion. The court needs some clarity and I'd like to ask first

12   questions of the government.

13        My first question is limited to BOTOX. The superseding

14   indictment alleges that the defendant purchased BOTOX from

15   Medica Depot, Meds 4 Less, and other "unauthorized sources."

16   What is the government's theory as to why the sources were

17   unauthorized? In other words, how does the government intend

18   to prove its case with respect to this particular issue?

19        **MS. COZZONI:** So, Your Honor, the medical records

20   from the spa contain lot numbers of BOTOX and JUVÉDERM also and

21   other fillers, and those lot numbers can be traced to determine

22   the origin and the countries to which they're shipped and in

23   the United States they can continue tracing to very specific

24   locations. So when it ships to outside of the United States,

25   it goes out of the drug supply chain, and therefore, is not --

1   is not shipped by authorized trading partners, it's not sold by

2   authorized trading partners, those that are licensed within the

3   state.

4           THE COURT:  All right.  So if I'm to understand

5   correctly, Medica Depot, Meds 4 Less, and other unauthorized

6   sources all lack the necessary license; is that correct?

7           MS. COZZONI:  Correct.

8           THE COURT:  Okay.  And they do not sell BOTOX -- and

9   I'm limiting it to BOTOX right now -- none of those -- Medica

10  Depot, Meds 4 Less, and other undisclosed unauthorized

11  sources -- do not have the license that you say are necessary

12  to sell BOTOX; is that correct?

13          MS. COZZONI:  In Oklahoma, yes.

14          THE COURT:  In Oklahoma?

15          MS. COZZONI:  Probably anywhere.  But we're dealing

16  with Oklahoma is where it was sold, yes.

17          THE COURT:  Are there any states where they might

18  have a license?  I thought this was nationally licensed;

19  correct?

20          MS. COZZONI:  Well, the law states that you have one

21  per state, you have an individual state.

22          THE COURT:  I see.  Okay.  So you're not contending

23  errors in labeling, you're contending the lack of licensing?

24          MS. COZZONI:  Correct.  We're -- it is not in the

25  supply chain.

1          THE COURT:  All right.  Does the same theory apply

2     to the JUVÉDERM, or does the government intend to rely solely

3     on the fact that the JUVÉDERM Ultra 3 and JUVÉDERM Ultra 4 were

4     not approved for use in the United States?

5          MS. COZZONI:  Ultra 3 and 4 are not approved for use

6     in the United States.  And it's the same --

7          THE COURT:  Okay.

8          MS. COZZONI:  We would have tracked that it was

9     JUVÉDERM 3 and 4 based on the notes in the medical records.

10          THE COURT:  Okay.  So any other argument you'd like

11     to make with regard to this motion in limine?

12          MS. COZZONI:  No.  Again, the only -- that's the

13     evidence we intend to use to show the counts.  There will be

14     some discussion -- it's our intention to introduce evidence of

15     a discussion back in 2016 with FDA agents and in 2017 with

16     Oklahoma Medical Board with Ms. Sanders regarding advising her

17     that they had discovered that she was using these products and

18     advising her to quit, to not -- there's some discussion that

19     goes to the intent on that.

20          THE COURT:  In other words, you will be referring to

21     the boxes that were found in the trash-pulls?

22          MS. COZZONI:  Correct.  But we're not going to

23     dissect the boxes.  We don't intend to lay them up here and

24     tell you what was on them.  We intend to say, "Based off of

25     what you saw, what did you advise?"

1          THE COURT:  All right.  But you're not intending to

2     prosecute on the basis of those boxes that are no longer

3     available, but rather you're going to use that as background,

4     as I understand it, to give a basis or an explanation to the

5     jury as to why the conversations occurred between the FDA and

6     the defendant?

7          MS. COZZONI:  Correct.

8          THE COURT:  Okay.  Anything else?

9          MS. COZZONI:  No, Your Honor.

10          THE COURT:  All right.  And, Mr. Lyons, two

11    questions for you with regard to the motion in limine.

12          Is Ms. Sanders' motion in limine at docket 33 limited

13    to the vials and packaging for the drugs/devices charged in

14    Counts 3 through 10?

15          MR. LYONS:  Yes, sir.

16          THE COURT:  Okay.  And secondly, is Ms. Sanders

17    seeking to exclude any other evidence such as evidence from the

18    trash-pulls or other counts?  It sounds like they're not

19    relying on evidence of the trash-pulls but wish to refer to

20    those as a basis solely for explaining the conversation that

21    they'd had with Ms. Sanders.

22          MR. LYONS:  That's what Ms. Cozzoni said.  I don't

23    think that's accurate.

24          THE COURT:  Okay.

25          MR. LYONS:  And by that I don't mean to -- I'm not

1  impugning, you know, her character about what she said.  I just

2  think the evidence is going to still over and be a lot broader

3  than that and that it's impossible to do -- to make references

4  to those without violation of the best evidence rule because

5  what we're -- this is exceedingly convoluted with these

6  definitional phrases.

7          But in 2015, January 26, 2015, they apparently did a

8  trash-pull.  There's a conclusory statement in the search

9  warrant affidavit, and that is paragraph 44 and 45, that an

10 Allergan rep determined that those were not available for use

11 in the United States.  Well, that is not an equivalent

12 statement to the statutory definition of misbranding, it's just

13 not.  I mean, that's a square peg in a round hole if there ever

14 was one, okay?

15         THE COURT:  Maybe you can avoid all this by saying

16 generally there was a trash-pull that upon which the FDA

17 relied -- or the FDA decided it needed to speak to Ms. Sanders

18 without getting into the details of the trash-pull.  Would that

19 be satisfactory to the defendant?

20         MR. LYONS:  Well, if it were a limiting issue just

21 as benign as that, that would probably suffice.  But I don't

22 know how that conversation in 2015 can occur and then be

23 related to the current charges without marrying those two

24 things up.  I don't know how there could be charges for the

25 2018 wire fraud principally, and then maybe the mail fraud

1  charges, without going back and saying, well, we warned you in
2  2015 you weren't supposed to use this unauthorized use of BOTOX
3  and there you are doing it again.  They have to marry those two
4  things up to show the intent.  Otherwise, it's a meaningless
5  statement.
6          THE COURT:  Well, they don't have to marry it to the
7  trash-pull.  They can simply say, we went in and warned her,
8  and then you all can argue about whether the warning pertained
9  to any of these charges; right?
10         MR. LYONS:  The way I see it unfolding, Judge, is if
11 they say just benignly we went in and warned her, well, what
12 did you warn her about?  It's invariably I think going to have
13 to go that next step to say, what did you warn her about,
14 before the government can say now three years after she was
15 warned she's doing the same thing; therefore, there's the
16 intent based on the warning three years ago.
17         THE COURT:  So you're saying they have to get into
18 the trash-pull?
19         MR. LYONS:  I do.  That's my belief.  I don't know
20 how it would happen otherwise.
21         THE COURT:  Well, let me ask Ms. Cozzoni:  Is there
22 any way we could get around the specifics of the trash-pull?
23 Because obviously the trash-pull doesn't form evidence relating
24 to any of these counts; correct?
25         MS. COZZONI:  Correct.  I mean, I don't intend to --

1    the trash-pull was done to try to -- to see if it was still

2    going on, you know, to verify evidence.  We don't intend to go

3    into here's everything we found in a trash-pull.

4              THE COURT:  Right.  And as I understand, you had the

5    conversation -- or the FDA had the conversation after the

6    trash-pull?

7              MS. COZZONI:  Yes.  About in 2016, so about, gosh,

8    over a year.

9              THE COURT:  All right.  Any other argument with

10   regard to this motion in limine?

11             MR. LYONS:  The other argument -- or another part of

12   the argument is that the government keeps using the phrase

13   "unauthorized sources" to make that equivocal to a misbranded

14   drug, and those two things are not equivocal and the government

15   in my estimation is going to try to argue that the receipt of

16   drugs from unauthorized sources is also a crime.  They're going

17   -- in my estimation, they're going to equate the mere receipt

18   of unauthorized -- of drugs from unauthorized sources or from

19   Mumbai, India, or from drug sources that were destined for some

20   other location with a misbranded drug, and therefore,

21   misbranded drug is the equivalent of wire fraud.

22             THE COURT:  Okay.  We're getting a little away from

23   either the motion in limine or the scope, I think.

24             MR. LYONS:  Well, my motion in limine has always

25   raised the issue the government can't be allowed to claim that

1  buying drugs or getting drugs from unauthorized sources is a
2  crime because it's not.  It can't be because we're here for
3  wire fraud and mail fraud which are specific-intent crimes.  So
4  that's always been my concern.  And then a --
5          **THE COURT:**  I understand.  But doesn't my written
6  order of June 4th, doesn't it address your concern?
7          **MR. LYONS:**  I don't think it's going to do it well
8  enough.
9          **THE COURT:**  Okay.  Well, you can take it up to the
10  circuit.  Anything else?
11          **MR. LYONS:**  Right.  Well, one other issue is that --
12  and I'm not trying to be difficult on it -- I foresee --
13          **THE COURT:**  I understand.  It's just that we get the
14  same arguments over and over again.
15          **MR. LYONS:**  I'm sorry.  If the motion to suppress is
16  granted because they talked about the evidence of this
17  JUVÉDERM, JUVÉDERM 3, 4, those kinds of things, if my motion to
18  suppress is granted, none of those things come in because they
19  only found those from the patient records during the search.
20          **THE COURT:**  I understand.  So we're going to address
21  today the scope of the search?
22          **MR. LYONS:**  Yes, sir.
23          **THE COURT:**  Right.  So anything -- but before we do
24  that, the third item here is your motion in limine.  Any other
25  argument with regard to evidence of the trash-pulls?

1        **MR. LYONS:**  No, Your Honor.

2        **THE COURT:**  Okay.  Now we're on the fourth item, the

3    motion to quash the search and seizure and suppress all

4    evidence obtained therefrom, which is docket No. 34.  The court

5    entered a 14-page order with regard to two parts of the

6    three-part motion to quash, or what we viewed as essentially

7    three parts, and we set today's hearing to be limited in scope

8    to the discrete issue of whether executing officers exceeded

9    the scope of the warrant.  From the court's perspective, the

10   key issue is how executing officers determined that a record

11   pertained to the, quote, purchase, receipt, possession,

12   storage, sale, and/or administration of misbranded drugs or

13   devices.

14        And I do have a question of counsel for the government

15   as we begin.  The government seized patient records as to 1,282

16   patients.  Are those limited in time at all?  Or is 1,282 all

17   of the customer files of this particular spa?

18        **MR. PROCTOR:**  Your Honor, they are limited in scope.

19   However, we would be happy to call Agent Bain to explain in

20   further detail exactly how they were limited in scope when they

21   were seized, if Your Honor would prefer to move on directly to

22   evidence.

23        **THE COURT:**  Well, you're right, the testimony is

24   what's going to control.  I just wanted to understand how they

25   were limited.  You may call your first witness.

1    **MR. PROCTOR:**  Yes, Your Honor.  We would call

2    Special Agent Jeremy Bain to the stand.

3            **MR. LYONS:**  I move to invoke the rule of

4    sequestration, Your Honor.

5            **THE COURT:**  Very well.  The rule of sequestration

6    has been revoked.  Under the rule of sequestration, any

7    witnesses who are expected to testify must remain outside the

8    courtroom until called to testify in this matter.  If any

9    witnesses do remain in the courtroom during the testimony of

10   other witnesses, they may not be permitted to testify.

11           Counsel, if you'll look to your own witnesses, please.

12           **DEPUTY COURT CLERK:**  Do you solemnly swear the

13   testimony you will give in the matter pending before this court

14   will be the truth, the whole truth, and nothing but the truth,

15   so help you God?

16                          *JEREMY BAIN,*

17   *after having been first duly sworn, says in reply to the*

18   *questions propounded as follows, to-wit:*

19           **THE COURT:**  Mr. Proctor.

20                    **DIRECT EXAMINATION**

21   BY MR. PROCTOR:

22   Q.    May it please the court.  Sir, can you please state your

23   full name and spell your last name for the record?

24   A.    Jeremy Bain, B, as in "boy," a-i-n.

25   Q.    Sir, for which agency do you work?

1  **A.**      I'm a special agent with the Food and Drug

2  Administration's Office of Criminal Investigations.

3  **Q.**      As a special agent with the -- I believe it's the FDA --

4  what's your -- what's your role?

5  **A.**      Our role is to investigate allegations of criminal

6  misconduct that violates the Food, Drug and Cosmetic Act as

7  well as other Title 18 violations.

8            **THE COURT:**  Just one second.

9            **MR. LYONS:**  May I interrupt for a minute?  I can't

10 see the witness.

11           **THE COURT:**  Oh, you can move around, if you'd like.

12              *(Discussion held off the record)*

13 **Q.**      **(BY MR. PROCTOR)**  So, Agent Bain, can you -- how many

14 years have you held this position with the FDA?

15 **A.**      Nine and a half years.

16 **Q.**      And were you in law enforcement prior to this?

17 **A.**      I was, yes.

18 **Q.**      How many years roughly?

19 **A.**      I've got a total of 22 years.

20 **Q.**      And in that 22 years of total law enforcement, have you

21 executed -- or drafted and executed search warrant

22 applications?

23 **A.**      Yes, I have.

24 **Q.**      Okay.  I'm going to draw your potential pretty obviously

25 to the search warrant in this case from I believe it's May 8th,

1  2018.  Are you familiar with that warrant?

2  A.  Yes, I am.

3  Q.  Are you familiar with the affidavit attached to that

4  warrant?

5  A.  I am.

6  Q.  And how are you familiar with all those documents?

7  A.  I was the affiant on that affidavit.

8  Q.  So you were the lead agent on this?

9  A.  That's correct.

10  Q.  Are you familiar with the -- with the attachment B?

11  A.  Yes.

12         MR. PROCTOR:  Now, your Honor, I believe defense

13  counsel has placed a binder of exhibits on the witness' desk

14  with -- if defense counsel's comfortable, I would just use his

15  documents.

16         THE COURT:  Very well.

17  Q.  (BY MR. PROCTOR)  All right.  If you could -- I believe

18  it's -- if you could switch or shift over to tab 4, if I'm

19  correct.  I don't have it in front of me, that particular

20  binder, but is that the attachment B?

21  A.  Yes, it is.

22  Q.  Is it the one that you used in this -- in this search?

23  A.  It does look the same.

24  Q.  All right.  If you could look down at number item 10,

25  about one, two, three, four, five, six -- seven lines down in

1   the middle.  Do you see where it says "medical records"?

2   **A.**   Yes, I do.

3   **Q.**   What do you understand that to mean in this attachment B?

4   **A.**   Records obtained, collected as part of the normal

5   business of a spa or a medical office.

6   **Q.**   Okay.  And how did you -- from this attachment B, how did

7   you understand, if any, limits on your medical records

8   seizures?

9            **MR. LYONS:**   Your Honor, I object.  I think the

10  language is supposed to be self-executing and it's, I think,

11  supposed to be self-explanatory.

12           **THE COURT:**   Well, I'd be surprised if Mr. Proctor

13  was not a textualist as well.  But I think this may be

14  revelatory so the objection's overruled.  Go ahead.

15  **Q.**   **(BY MR. PROCTOR)**  Was there --

16           **MR. PROCTOR:**   May I rephrase the question, Your

17  Honor?

18           **THE COURT:**   You may.

19  **Q.**   **(BY MR. PROCTOR)**  Was there a particular crime for which

20  you understood this to be limited?

21  **A.**   There was, yes.

22  **Q.**   Is there language in attachment B that you put in there

23  because -- or it was in there because you were intending to

24  limit this?

25  **A.**   Yes, there is.

Q.      Okay.  What language is that?

A.      Well, I think it starts at the top where we were only
interested in items related to products that were misbranded
drugs and devices.

Q.      Okay.  Now, let's turn our attention now to the actual
search which, I believe, took place on May 15th of 2018; is
that correct?

A.      That sounds correct.

Q.      All right.  Can you just give me a -- what happened when
you and your team arrived at the spa?

A.      So we utilized the services of the Tulsa Police
Department in the entry into the business.  We do that for
safety reasons --

Q.      Just if I can pause real quick.  When you say "safety
reasons," what particular concerns do you have in a typical
search?

A.      Believe it or not, not everybody recognizes that FDA has
an law-enforcement arm.  So we find it beneficial to everyone
involved to have a uniformed police officer to have a
recognition that, you know, law enforcement has entered their
building.

Q.      Is this a safety fact as well as a --

A.      Absolutely.

Q.      Okay.  So I apologize.  I interrupted.  If you could
continue.  You enter the spa?

1   **A.**     Yep.   So myself and the uniformed officer made entry into

2   the business.   The business was open so we just walked right

3   in.   As I recall, we made -- I made contact with whoever was

4   right there at the front.   I don't recall who that person was.

5   I was most interested in either establishing primary contact

6   with either Mrs. Sanders or the doctor that was on staff that

7   day.

8   **Q.**     Okay.   Once you -- did you then move on to the actual

9   search?

10  **A.**     Yes, we did.

11  **Q.**     All right.   Were you searching for medical records as per

12  the attachment B?

13  **A.**     Yes, we were.

14  **Q.**     Okay.   Can you walk me through -- because this is -- the

15  primary focus of this hearing is about the large number of

16  medical records taken, can you please walk me through the

17  process by which you selected the records to be taken from the

18  site?

19  **A.**     Sure.   So during our investigation, we learned that there

20  was a multitude of services that were offered at that spa.   Not

21  all of those services were of interest to our investigation.

22  So my instructions to the agents were that when we get in there

23  and start going through the medical files, that we need to

24  concentrate on only pulling the files that have a reference to

25  either BOTOX or a dermal filler.   And so the agents that were

1   there that day had the unlucky selection of having to go

2   through each medical file personally to pull out the ones that

3   had that designation of either the BOTOX for the dermal filler.

4   Q.      Now, you say they went through the file.  Was it an

5   in-depth review or more of a cursory glance?

6   A.      Very quick, brief cursory search.

7   Q.      How many agents approximately do you recall involved in

8   this search?

9   A.      I think we had probably about ten.

10  Q.      And rough idea how long it took to go through all of

11  those records?

12  A.      Maybe five hours.

13  Q.      So you spent a considerable amount of time and man-hours

14  sorting through these records to select the relevant ones?

15  A.      Absolutely.

16  Q.      In accordance with as you understood the warrant; is that

17  correct?

18  A.      Yes.

19  Q.      So do you recall roughly how many records you ended up

20  taking?

21  A.      Just over a thousand.

22  Q.      Okay.  But, again, that was a subtotal of the total

23  number of records?

24  A.      That's correct.

25  Q.      All right.  Now that you -- let's -- what did you do with

1   those records that you seized?

2   **A.**     So the records we seized we boxed up and we sent to our

3   document processing center to be electronically scanned and

4   archived.

5   **Q.**     And did you then search all of those records in detail?

6   **A.**     No, we did not.

7   **Q.**     How many -- or how did you then discriminate within those

8   records in order to know which ones to look in with more

9   detail?

10  **A.**     So the next step after we had done the gathering of the

11  documents or the files that I just described, I put together a

12  letter that was then sent out to as many patients as we could

13  send it to based on the information in the file.  So we sent a

14  letter to the 1,000-plus patients based on the address in the

15  file.

16          The purpose of that letter was kind of threefold.  One

17  was to inform them that there was an investigation occurring;

18  two was to let them know that we had their original patient

19  file; and three was to ask them to contact us in the event that

20  they had information related to this investigation.

21  **Q.**     And how many of those folks whom you mailed responded?

22  **A.**     Less than a hundred.

23  **Q.**     And was that the number of records that you went into in

24  detail?

25  **A.**     Yes.

1  Q.    So out of all the records both in there and seized, the

2  ones that you in detail searched were that -- I think you said

3  approximately a hundred?

4  A.    Yes.  Less than a hundred.

5  Q.    Okay.  Just very quickly, I believe the spa was a going

6  concern at this point?

7  A.    I'm sorry?

8  Q.    The spa, was it an ongoing business at this point?

9  A.    It was, yes.

10  Q.    Was there anything done to mitigate that to --

11  A.    There was, yeah.  The one thing that we always have to

12  consider when we go in and we do a search warrant at a business

13  that's still active -- and in this case, like I said, it still

14  had other services being rendered that weren't part of the

15  investigation.  So with that in mind, the plan was that we

16  needed to turn these documents -- or a copy of these documents

17  back over to them so they would have them for future visits by

18  patients.

19        So initially on the day of the search warrant, I

20  expressed this desire to the office manager and to Dr. Caldwell

21  and explained to them that it would take a couple weeks to get

22  all the documents returned back to them, but could we sit down

23  and maybe pull the next five or seven days of appointments that

24  they had on the books, and we would take those patient files

25  that we were going to take that appeared on that list and we

1  actually made photocopies there in the office of those files so
2  that they would have them when that patient came in.  So that
3  was kind of the first phase.

4       Then as we left and we went and started processing via
5  the bigger batch of documents, that process turned out to take
6  a little longer than expected.  We did another subset of
7  document return to them based on another week or ten days of
8  appointments that they had coming.  And by that time, our
9  process had caught up with itself and we were able to return a
10  complete set of these patient files in an electronic format
11  back to the business for operation.

12  Q.    All right.  Now, if you -- were you -- again, you
13  mentioned earlier that the attachment B was limited by the
14  specific crimes related and you understood that.  Were you
15  looking for evidence of any other crimes when you were going
16  through this?

17  A.    No.  Our focus was on what the affidavit explained as
18  well as what was in attachment B.

19  Q.    All right.

20       MR. PROCTOR:  Your Honor, may I consult with my
21  co-counsel very quickly?

22       THE COURT:  You may.

23       (Discussion held off the record)

24       MR. PROCTOR:  Your Honor, that's all we have at this
25  time and I would pass the witness.

1          THE COURT:  Cross-examination.

2          MR. LYONS:  Your Honor, may I reserve my

3   cross-examination of this witness until after I -- excuse me.

4   I had believed that in this motion to suppress I might be the

5   one going forward with the evidence so I had planned certain

6   witnesses in order.

7          Is this the only witness you all are going to call?

8          MR. PROCTOR:  Yes, it is.

9          THE COURT:  So any objection to allowing him to

10  reserve cross-examination?

11         MR. PROCTOR:  No objection, Your Honor.

12         THE COURT:  Very well.  You may step down, sir.

13         MR. LYONS:  Your Honor, may he also be subject to

14  the rule of sequestration instead of sitting at counsel table

15  as case agent just for the purpose of this?  I don't -- I think

16  it's very important for other agents' testimony, that we hear

17  it that way.

18         THE COURT:  Mr. Proctor, any objection?

19         MR. PROCTOR:  Your Honor, he's our case agent.  We

20  would prefer him to be here.

21         THE COURT:  Yeah, I think they're entitled to a

22  party rep.  So do you want to do your cross right now?

23         MR. LYONS:  No, sir.  I'll wait.  I'll reserve until

24  later.

25         THE COURT:  All right.  You may step down, sir.

1    The defendant may call her first witness.

2    **MR. LYONS:**  Defendant would call Joe McCulley.  Your

3    Honor, for purposes of reference, I will be referring initially

4    to Exhibit 20 of my proffered exhibit book.  And is it okay for

5    today's purposes that we offer and admit these exhibits now

6    without any need of further sponsorship?

7    **THE COURT:**  All 43?

8    **MR. LYONS:**  I'm sorry?

9    **THE COURT:**  All 43?

10   **MR. LYONS:**  Yes, sir.

11   **THE COURT:**  Any objection to the admission of these

12   exhibits for today's purposes only?

13   **MR. PROCTOR:**  No, Your Honor.

14   **THE COURT:**  Very well.  Defendant's Exhibits 1

15   through 43 are admitted without objection.

16   **MR. LYONS:**  Thank you.

17   **DEPUTY COURT CLERK:**  Sir, please step forward right

18   over here.

19                    *JOSEPH MCCULLEY,*

20   *after having been first duly sworn, says in reply to the*

21   *questions propounded as follows, to-wit:*

22   **THE COURT:**  Sir, if you would state your full name

23   for the record.

24   **THE WITNESS:**  Yeah.  My name is Joseph McCulley.

25   I'm a special agent with the Food and Drug Administration

1    Office of Criminal Investigations in Kansas City.

2           THE COURT:   Thank you, sir.  Mr. Lyons.

3           MR. LYONS:   Your Honor, may he unmask so I can

4    help with the --

5           THE COURT:   He may.

6           MR. LYONS:   -- understanding of the answers?

7           THE COURT:   He may.

8                        DIRECT EXAMINATION

9    BY MR. LYONS:

10   Q.    All right.  Mr. McCulley, briefly what's your educational

11   background?

12   A.    I have a criminal justice degree, bachelor's degree, and

13   then was a local police officer for a few years in Springfield,

14   Missouri.  Then I went on to the Secret Service in 2003 for

15   seven years before coming over to the FDA and been with the FDA

16   since 2010.  Went through training academies at all three

17   employers.

18   Q.    Okay.  So you're familiar with search warrant affidavits,

19   are you not?

20   A.    Yes, I am.

21   Q.    Have you ever drafted one before?

22   A.    Yes, I have.

23   Q.    So you know the requirement that the search warrant

24   affidavits describe particularly -- or with particularity the

25   item to be searched and/or to be seized?

1    **A.**    That's correct, yes.

2    **Q.**    And do you -- what is your understanding of the purpose

3    for the particularity description for a search warrant?

4    **A.**    Well, the items to be seized, we try to get enough

5    probable cause to identify the particular items that we believe

6    may be in violation of the law and those are the items that we

7    want to seize.

8    **Q.**    Okay.  And why is it important that you know what the

9    items are to be seized when you go in and execute a search

10   warrant?

11   **A.**    So we take what we're looking for, and that's really what

12   we do it for.

13   **Q.**    Have you ever heard the concept of a general warrant?

14            **MR. PROCTOR:**    Objection, Your Honor.  I believe Your

15   Honor addressed the particularity issue in your order and

16   opinion.  This is limited to whether or not the search exceeded

17   the scope, not whether or not this is a general warrant.

18            **MR. LYONS:**    Well, that's my point, Your Honor.  I

19   need to know his understanding of how they're served.

20            **THE COURT:**    My understanding is that a general

21   warrant is within the scope of what we're inquiring about

22   today.  Because if a search exceeds the -- is excessive, it is

23   as a matter of law considered, or may be considered, a general

24   warrant, and therefore, can be, what, voided, I guess, or

25   suppressed.  I know it's an extraordinary remedy under certain

1   case law, but I think it's within the bounds of what we're here

2   to do.  So overruled.  Go ahead.

3   Q.    **(BY MR. LYONS)**  So do you know what constitutes a general

4   warrant?

5   A.    I'm not familiar with that term, no.

6   Q.    All right.  Prior to the service of this search warrant,

7   did you read a -- or were you given and did you read a copy of

8   the search warrant affidavit?

9   A.    Yes, I did.

10  Q.    So you were familiar with the terms in there and the

11  items that were set forth?

12  A.    Yes, I am.

13  Q.    And did you also receive a copy of the search warrant and

14  read that before you went in and helped execute it?

15  A.    Yes, I did.

16  Q.    All right, sir.  Turn your attention in the book in front

17  of you to -- it's item No. 3.

18                *(Discussion held off the record)*

19  Q.    **(BY MR. LYONS)**  All right.  Do you have the hard copy in

20  front of you or do you see it here on the screen in front of

21  you?

22  A.    Yes.  I have tab 3 open to the application for search

23  warrant.

24  Q.    All right.  And did the search warrant indicate that you

25  were to search for certain items?

1   **A.**     Yes.  The warrant does say we will be searching for

2   evidence of a crime or contraband, fruits of a crime, or other

3   items illegally possessed.

4   **Q.**     Okay.  Now, what is your working definition or a

5   statutory definition, if you know, of what is a fruit of a

6   crime?  How do you know a fruit of a crime when you see it?

7   **A.**     Those items which make up a crime is how I would describe

8   it.

9   **Q.**     Like what?

10  **A.**     Well, I mean, particularly just in our case here, it

11  would be records which show specific items that may or may not

12  be illegal to possess.

13  **Q.**     Okay.  What records?  What kind of records?

14  **A.**     In this case, it was medical records.

15  **Q.**     Medical records of -- okay.  Medical records in my

16  estimation is a broad term, but did you see anywhere in the

17  search warrant itself that it said that you were to seize

18  patient records?

19  **A.**     Attachment B, if I recall, said we were looking for --

20  can I turn to that --

21  **Q.**     Certainly.

22  **A.**     -- to attachment B?  I don't know what tab to look for.

23  **Q.**     Look behind tab 4.

24  **A.**     Yeah.  So, yeah, attachment B, item 10, we were looking

25  for all business records and related correspondence in whatever

form, including handwritten and computer-generated, pertaining to the purchase, receipt, possession, storage, sale, or administration of misbranded drugs or devices.

Q.     Okay.  Now, what say -- let me back up.

A misbranded drug has a statutory definition, does it not?

A.     Yes.

Q.     Okay.  What's a misbranded drug?

A.     A drug -- so it's kind of -- it's a difficult thing to describe.  But it's basically -- it's a -- misbranding a drug is kind of a drug that doesn't meet the requirements of an FDA-approved drug is how I understood it.  It's a confusing way to kind of define misbranding.

Q.     Okay.  So you went in looking for -- you went in at L'Chaim looking for misbranded drugs, and your working knowledge of what constitutes a misbranded drug is based on some confusing definition that is -- what, is it drug-specific? Is it manufacturer-specific?  What were you -- what was -- let me back up.

How were you going to know when you were looking through business records when you found evidence of a misbranded drug?

A.     We were looking for drugs that were administered that could have been misbranded.

Q.     Okay.  Now, do you agree with me that to know that

1  misbranded drugs were administered, that you would have had to

2  have looked at the vials or the boxes or the package inserts to

3  determine whether or not they had been misbranded?

4  A.    We can review the lot numbers that can tell us whether or

5  not a drug, a particular drug, received FDA approval to be sold

6  in the United States.  So our job when we went in to find these

7  medical patient files was to make sure that we took all

8  possible patient files that had possible misbranded drugs.

9  Q.    Okay.

10  A.    Because on scene, we don't have time to review every lot

11  number, call our representatives that can confirm where those

12  drugs were being intended for use and whether or not they are

13  approved for use in the United States.  So we take all of the

14  medical records that would potentially be misbranded and we

15  confirm that those records are -- those lot numbers are or not

16  misbranded and that's how we determine which drugs are

17  misbranded.

18        I can look at a vial and tell by looking at the vial

19  itself if it's misbranded by the indicators that are

20  FDA-approved requirements of the drug.  But at that time of the

21  warrant we were looking for records, patient records, that

22  would point us in the direction of misbranded drugs.

23  Q.    So how did you know which patient records to look through

24  before you went there?

25  A.    We were pulling anything that could possibly be a

1  misbranded drug.

2  **Q.**     Okay.

3  **A.**     So any -- any cosmetic injectable that fits into the

4  attachment B items, we were pulling those records out for

5  review and seizure until we were able to confirm that they were

6  or were not FDA-approved lot numbers.

7  **Q.**     So how many patient records were there?  How many patient

8  files were there at L'Chaim?

9  **A.**     They were thousands of patient records.  I don't know the

10  count.  But there were a room that contained multiple shelves

11  and thousands of records of patient files.  In ten years, I

12  haven't seen a warrant that was so specific as to pulling

13  exactly which record had BOTOX used on the patient.  We pulled

14  only the files that showed an indication of BOTOX, JUVÉDERM, or

15  some other cosmetic injectable that was used on the patient.

16  Those were the only records that we kept.

17  **Q.**     All right.  Now, is it -- did you all go through every

18  patient record there?  And we've had -- let's just assume that

19  there were -- I don't know.  You give me a number.  How many

20  thousands of patient files were there?

21  **A.**     Well --

22  **Q.**     3,000?  5,000?  How many?

23  **A.**     Let's say five to ten thousand.  I really don't know.  I

24  would be guessing.

25  **Q.**     Okay.

1    **A.**    Thousands.

2    **Q.**    May I use the number five to ten thousand patient

3    records?

4    **A.**    Sure.

5    **Q.**    So did you all -- in executing the search warrant, were

6    you instructed to open up every patient file, make a

7    determination then of something found in that file, to then say

8    we're going to put that back at L'Chaim or we're going to put

9    this in the pile to investigate further?  Is that a fair

10   overview?

11            **MR. PROCTOR:**   Your Honor, just quickly I would like

12   to object on speculation grounds.   He asking -- the witness has

13   made clear he doesn't know how many files there were.

14            **THE COURT:**   Overruled.   It's a fair question.   Go

15   ahead.

16   **Q.**    **(BY MR. LYONS)**  Okay.   Was that the process?

17   **A.**    Yes, that was the process.

18   **Q.**    Okay.   And when you looked in the patient files, you were

19   looking for evidence there of BOTOX, JUVÉDERM, and what?

20   **A.**    Cosmetic injectables.

21   **Q.**    What other injectables?

22   **A.**    I believe the -- primarily BOTOX and JUVÉDERM was, I

23   believe, the scope of the warrant that we were looking for.

24   **Q.**    Okay.   Now, my understanding -- but you tell me -- my

25   understanding since you read the search warrant affidavit is

1   that there was evidence found in 2015.   Particularly

2   January 26, 2015, there was some evidence that indicated there

3   was some boxes of BOTOX that had not been approved for

4   distribution within the United States.   And if you want to look

5   at that, agent, if you'll look at Exhibit 1, page 12, down at

6   the bottom, paragraphs 41 and 42.

7   **A.**   Okay.

8   **Q.**   Do you see it there on the yellow highlighted version

9   that I got on the screen?

10  **A.**   Yes.

11  **Q.**   All right.   Do you know of any other reference of what

12  I'm going to categorize as "misbranded BOTOX" other than this

13  incident in January 26th of 2015?

14  **A.**   I don't understand your question.   Can you rephrase it,

15  please?

16  **Q.**   Okay.   I don't know how to make it more clear but I'll

17  try.

18          To my reading of the affidavit -- but you correct me if

19  I'm wrong -- paragraphs 41 and 42 are the only indication of

20  anytime that there has been arguably a misbranded box of BOTOX

21  found that was associated with L'Chaim.   Do you agree or

22  disagree with that?

23  **A.**   I agree that that statement made on paragraph 41 and 42

24  outlines one instance where it was found.   I have not worked

25  this case in its entirety to know if there were other instances

1  that may have been found, but I can tell you that it was found

2  on January 26th, 2015, in a trash-pull.

3  Q.    All right.  Now, this is a hypothetical question because

4  if there was no other indication of misbranded BOTOX found

5  between January the 26th of 2015 and April May the 15th of 2018

6  when this search warrant was served, then what indication was

7  there?  What probable cause was there to believe that

8  misbranded BOTOX was going to be found at L'Chaim when a search

9  occurred?

10  A.    I was also under the understanding that a misbranded drug

11  also can be administered if there isn't a valid doctor-patient

12  relationship.  Therefore, any drugs that were administered

13  without a proper doctor and patient relationship is misbranded

14  based on the definition of the law.

15        THE COURT:  Mr. Lyons, with all due respect, you're

16  getting into probable cause, and I specifically stated in the

17  written order that we would not be getting into that today,

18  that's been decided by the court.  Is there any relevance in

19  terms of the scope of the search to this questioning?

20        MR. LYONS:  Yes, Judge.  And I'll try to clear that

21  up if it's unclear.  I'll try and clear that up right now.

22        THE COURT:  All right.

23        MR. LYONS:  Okay.

24  Q.    (BY MR. LYONS)  My recollection is -- and if you'll look

25  at Exhibit 1, which is the search warrant affidavit, and if you

1   look at page 13 and if you'll look at paragraphs 48 -- just

2   generally 48 to 94, I'm going to suggest to you there's six

3   specific instances -- six specific patients that are shown as

4   having had procedures done at L'Chaim for which this search

5   warrant -- you know, probable cause was found and a search

6   warrant was issued.

7           Do you agree that there were six patients listed?  This

8   isn't a trick question.  I'm not trying to do it that way.

9   **A.**     Yeah.  I have not -- I haven't read that specific to

10  right now.  But if you're telling me there was six patients --

11  tell me those paragraphs again.

12  **Q.**     Paragraphs 48 to 96 -- or 94 actually.

13  **A.**     Oh, okay.  I can see there was multiple patients listed

14  there in those paragraphs.

15  **Q.**     Okay.  Now, there's two ways, as you talked about, of a

16  drug being misbranded.  It can be defined as misbranded because

17  it's improperly administered, and that's what you talked about;

18  right?

19  **A.**     Yes.

20  **Q.**     Okay.

21  **A.**     Correct, yes.

22  **Q.**     And then there's a misbranding issue because the contents

23  of the packaging don't meet with FDA requirements.  Is that

24  accurate also?

25  **A.**     That's correct.

1    Q.    All right.  So when you were directed and when you were

2    going to do the search at L'Chaim, tell me why you were looking

3    through these thousands of patient files.  What was going to be

4    your evidence when you found it in a patient file of misbranded

5    BOTOX?  In other words, how were you going to know when you

6    looked at a patient file when to stop your search?

7    A.    Well, our instructions, based on the facts in the case,

8    was to pull all BOTOX and JUVÉDERM records so they could be

9    reviewed by the case agent at a later date; and then if those

10   were determined to be misbranded drugs, those would then be the

11   evidence that would be retained.  But if it was found -- like I

12   said, in order to confirm that they were misbranded, it can't

13   be done on scene, especially with 10,000 patients, patient

14   files.  So those -- those patient files which fell into the

15   parameters of BOTOX patients and JUVÉDERM patients were pulled

16   to be reviewed.

17   Q.    All right.  Now, continue with Exhibit 4, which is the

18   search warrant Exhibit B.  Have you got that there in front of

19   you?

20   A.    Yes, I do.

21   Q.    Okay.  So you were directed to search for all items which

22   constitute evidence, fruits and instrumentalities of violations

23   of federal law.  Do you know what an instrumentality is of a

24   violation of federal law?

25   A.    That's particular -- I read that as saying any evidence

or the fruits and components that would make up a violation of

federal law is how I would read that.

Q.     Okay.  So when you look for fruits and instrumentalities

for violations of -- in this particular case, it says 21 U.S.C.

331; correct?  Which is a big broad statute; right?

A.     Uh-huh.

Q.     How did you know what you were going to find that

constituted an instrumentality or fruit for a violation of the

entirety of 21 U.S.C. 331?

A.     We were instructed to pull all business records and

patient records that showed patients which received BOTOX and

JUVÉDERM, and therefore, those records would be reviewed to see

which ones of those records were misbranded.

Q.     Was there a single file folder of either business records

or patient records at L'Chaim that day that was not reviewed?

A.     To the best of my knowledge -- like I said, in ten years

I've never seen a warrant that was so precise.  In every --

every different file that we could find, we reviewed and we

pulled the ones that had BOTOX and JUVÉDERM for further review.

Q.     Well, I understand.  But you also told us earlier that

you had to pull the other files to then see, well, this one

doesn't have BOTOX or JUVÉDERM and you put it aside; correct?

A.     We just -- we can't take it out.  We kept them for the

most part in their specific shelf.  We pulled back the file.

If it had BOTOX or JUVÉDERM, it was removed as evidence.

1   Otherwise, it was folded back up and left right where we found

2   it.

3   Q.     Okay.  But --

4          THE COURT:  But in answer to his question, which is

5   a fair question, he's basically asking, did you look through

6   all of the files?  You had estimated that there may have been

7   5,000 files.  Did you go through all of the files there to be

8   able to get the 1282?

9          THE WITNESS:  Yes.  I didn't particularly but we had

10  a group of agents who did.

11  Q.     (BY MR. LYONS)  Now, in addition to the patient files,

12  did you go through -- or well, let me ask this.

13         What part of the search were you focusing on, the

14  patient records or some other part?

15  A.     Well, my particular job at the search warrant was to

16  photograph the scene and to sketch the scene.  After I was done

17  photographing and sketching, I helped search for patient

18  records as well.  That was not my full-time job at the search

19  warrant.  I did come in and do that during the search warrant

20  but that was not my primary focus.

21  Q.     Okay.  If you can turn quickly to Exhibit No. 20.

22  A.     Yes.

23  Q.     All right.  Is that a sketch that was done of the L'Chaim

24  facility before the search warrant was issued?

25  A.     No.  I did that sketch during the search warrant with pen

1  and paper and I brought it back to my office and cleaned it up

2  on my computer.  So I put that together.

3  Q.    All right.  So if you will look then at Exhibit 21, this

4  is an indication -- this is what we had gleaned from the other

5  documents.  And if you'll look at 21 and 22 at the same time,

6  was this letter A posted in a room at L'Chaim?

7  A.    Yes.

8  Q.    All right.  And J.M., is that you?

9  A.    That's correct.

10  Q.    Okay.  Did you search room A?

11  A.    I was one of the agents who searched room A, yes.

12  Q.    Okay.  What did you find in room A?  What were you

13  looking for in the entry -- in the main entry area as evidence

14  of a crime?

15  A.    Patient files which may show a patient who used -- who

16  had administered BOTOX or JUVÉDERM.

17  Q.    And did you find any there?

18  A.    I don't recall without going back and looking through all

19  the evidence to find out if there was any patient files located

20  in the -- in room A.

21  Q.    All right.  And then according to Exhibit 21, you also

22  searched the east exam room -- wait a minute.  If you look

23  under C, you searched east exam room, oh, No. 1; under I, you

24  searched east exam room; and under L, you searched center exam

25  room No. 2?

**A.**     That's correct.

**Q.**     All right.  Did you make a list of the items that you searched for or seized out of those rooms?

**A.**     It -- can I just back up to --

**Q.**     Okay.  I wish you'd answer my question first.

**A.**     Yeah.  There was a list made of all evidence that was taken, yes; that is, the evidence logged.

**Q.**     Okay.  Do me this favor then because we are kind of confused about some of these items.

Look at -- start at Exhibit No. 8 and look at 8 through about 19 or -- yeah, 8 through 18.  Because we got these lists of all these -- just lists of patient names.  Did you create any of these documents?  And when it says, for example, on page -- excuse me -- Exhibit 8, up at the top, it says box 2, item 2.  Then the next page says box 2, item 2.  There are multiple references to that.  For example, on item -- Exhibit 9 it says box 3, item 2.  What does all this refer to?

**A.**     When the items are taken as evidence, they're placed into boxes and then they're -- there's another line item that says which item they are.  And so I'd have to go to the evidence log in its entirety to see where that box was found.  Because on that evidence log it will also say box 2 found in room M and then it will be found -- that's how they -- that's how it's done when we get done with the warrant.

MR. **LYONS:**  Your Honor, may I speak with Ms. Cozzoni

1    for a moment?

2              THE COURT:   Yes.

3              *(Discussion held off the record)*

4    Q.   (BY MR. LYONS)   In looking at these Exhibits 8 through

5    about 18, can you tell me which one of these is your

6    handwriting, if any of them are, and what they relate to?

7    A.      That's not my handwriting.   Most -- like I said, there

8    was so many boxes that as agents were finding, identifying

9    patient files that had patients who used BOTOX and JUVÉDERM

10   from the main file room, there were an agent that would

11   probably open it up, say yes, patient Thomas had BOTOX, they

12   would set it to the side.   There would be another agent who

13   would actually say Thomas, would write this list then.   So that

14   when the business owner came back to their business after the

15   search warrant, they could tell which -- which files we took.

16   Q.      Okay.   How could you tell just by opening a file up?

17   What was there in it that said BOTOX, JUVÉDERM, dermal filler,

18   any of those had been used?   In other words, was there a big

19   label on the inside or did you have to flip through --

20   A.      There were -- there were diagrams of the face that showed

21   where cosmetic injectables were injected in the patients who

22   had cosmetic injectables.   Then we would look further to see if

23   there was actually BOTOX was the injectable that was used.

24   Q.      So is it a fair statement -- is it a fair statement then

25   that in -- as you were motioning earlier, it indicated like an

1    agent would just pick up a file, open it, immediately be able
2    to tell BOTOX or JUVÉDERM or a dermal filler.  But is it more
3    accurate to say that the agent would have to open the file,
4    look through some records, exam the contents of the records to
5    then determine if BOTOX, JUVÉDERM, or a dermal filler had been
6    used; and if so, then that file went in kind of stack A over
7    here, and if those things weren't used, it went in stack B?  Is
8    that fair?

9    A.    That's true, yes.  You couldn't tell from the outside of
10   the file which patients had BOTOX or JUVÉDERM so we had to open
11   it up and leaf through I believe it was the right side of the
12   file.  If they had the diagram of the face that then listed
13   BOTOX or JUVÉDERM, it was taken as evidence.

14   Q.    Did you look through any files other than patient files?
15   And I mean you, yourself.  Did you look through business files?

16   A.    We looked at any and all records that could contain
17   evidence of a misbranded drug.

18   Q.    Did you?

19   A.    I don't recall.

20   Q.    All right.  According to -- then if you would look at
21   Exhibit 21, which lists everybody that did the searches, and
22   have, I guess, item 20 there with you, the outline of it.  So
23   you did -- you conducted the search for the main entryway, and
24   you did item C, you did east exam room No. 1.  And if we may,
25   just so we're -- we can follow this in sequence, turn over to

1  Exhibit -- well, wait a minute.

2  **A.**      Before we leave that exhibit there, 22, can I clarify

3  something about what that list means, that room assignment

4  list?

5           **THE COURT:**  You mean 21?

6  **A.**      Yeah, 21.  Sorry.  Room assignment list.  The agent who

7  is the last agent to basically verify that everything in there

8  that has been checked is the agent that's listed.  The agents

9  who actually do the search are more than just what's on the

10  list in each room.  Do you see what I'm saying?

11  **Q.**      **(BY MR. LYONS)**  No.

12  **A.**      Because these rooms are large and there's thousands of

13  records.  So let's -- we need to find the room that is the main

14  patient file room.  Is that T?  No, that's the spot --

15  **Q.**      No.  It's D and there's no names listed for who searched

16  D.

17  **A.**      So that's because -- I can't exactly say why there's no

18  name listed there.  But all agents that were in the building

19  searching for patient files had access to that room during the

20  time of the search warrant looking for items that were on

21  attachment B.  The agent who's actually listed on the right

22  there as the officer is just the agent who verifies at the end

23  of the warrant that that room has been searched.

24  **Q.**      All right.  So if you'll look turn to Exhibit 22.

25  **A.**      Okay.

1  Q.     It's got the letter A; it's got your initials, J.M. 1650.

2  What is that supposed to indicate?

3  A.     So, like I said, at the end of the warrant, I go through

4  and I verify that every room has been searched and I sign it

5  with my initials and I time it, what time the search of that

6  room was verified.

7  Q.     Okay.  What time did the search start?

8  A.     Can you point me to an attachment?  I'm not positive.

9  Typically in the morning.  I don't know.

10 Q.     Well, okay.  How long was room A searched?

11 A.     Room A, the facility itself --

12 Q.     Sir, please --

13 A.     -- was searched during the entire time of the entire

14 warrant.  I can't give you an exact time.

15 Q.     Well, then tell me you can't give me an exact time.

16 That's a legitimate answer.

17 A.     Okay.  Yeah.

18 Q.     So you don't know what time the search started.

19 According to item -- excuse me -- Exhibit 22, whatever ended,

20 it ended at 1650 hours; is that accurate?

21 A.     That room was verified as searched at that time, correct.

22 Q.     And was the entirety of the room searched?

23 A.     Yes.  Anywhere there could be records related to the

24 purchase, receipt, or storage of misbranded drugs or devices --

25 Q.     All right.

1    **A.**     -- or any of the other items in attachment B.

2    **Q.**     Now, Exhibit 21 says you also searched room -- exam room

3    1 which is -- which was given a letter designation C, and

4    that's behind Exhibit 24.

5    **A.**     Correct.

6    **Q.**     All right.  Do you know what time that search started?

7    **A.**     The search warrant, according to the operations plan,

8    began at 10:00 a.m.  So the search of the facility started then

9    and it ended -- that room was verified at 11:30 a.m.

10   **Q.**     Okay.  Did you search the room from 10:00 a.m. to 11:30?

11   **A.**     Like I said, I verify at 11:30 that the room has been

12   searched, and that's what these letter are for just to make

13   sure we don't miss a room.  And then it's just -- I can't tell

14   you exactly how long I was in that room.  I can just tell you

15   that at 11:30 I walked in room C and verified it had been

16   searched.

17   **Q.**     Can you tell me how long you searched in the room or what

18   you found in the room?

19   **A.**     I can't tell you that without reviewing all the records

20   of room C.

21   **Q.**     What records of room C?

22   **A.**     The evidence log.

23   **Q.**     Where's the evidence log?  I've seen -- let me do this to

24   see if I can help you, okay, because I'm not -- I'm looking for

25   information here, okay?  Look at Exhibit 6.

1    A.    Okay.

2    Q.    And that is one of the inventory -- well, wait a minute.

3    Start back at Exhibit 5.  All right.  And that is the search

4    warrant return, okay, on Bates-numbered page 32333.

5    A.    Okay.

6    Q.    Do you see that?

7    A.    Yes.

8    Q.    Okay.  Where is this -- do any of these pages behind

9    Exhibit 5 or 6 indicate this log you're talking about?

10   A.    There are two views that are on the inventory of evidence

11   log.   There is a condensed view and there is an expanded view.

12   This appears to be the condensed view that doesn't give the

13   exact room numbers where these items were taken from.  It's

14   just an overall view that is provided so that the place -- the

15   item -- the owner of the building knows what items were taken.

16   Q.    All right.  Agent, may I please suggest if you'll listen

17   to my question more carefully and just get to the answer, we'll

18   get through this quicker.

19         Is this the log where you recorded the items you

20   searched for and seized or not, yes or no, Exhibits 5 and 6?

21   A.    I wasn't the evidence custodian so I don't know if this

22   is the log or not.  That would be a better question for them.

23   Q.    Okay.  Did you create a log of the items you seized?

24   A.    I did not.  I -- if I took an item, I filled out a piece

25   of paper that said I found item in this room and I gave it to

1  the evidence custodian who then entered it into a computer

2  and --

3  Q.    Where are those items -- where are those ones you

4  handwrote out?  Where are those documents that you handwrote

5  out and said you found?

6  A.    They're probably taped to the side of the boxes of

7  patient files.

8  Q.    All right.  Now, once again, did you search for anything

9  other -- search through any files other than patient files?

10 Did you look at business records?  Did you look at payment

11 files?  Did you look at credit card receipt files?  Did you

12 search for any of those items, you?

13 A.    I looked anywhere patient files could be stored.  That's

14 the best answer I can give you.  I don't know exactly what I

15 looked through because I was looking for patient files wherever

16 they could be stored in that building.

17 Q.    I just prefaced my question by saying I'm not talking

18 about patient files, okay?  Let me re-ask the question.

19        Did you look through any files other than patient

20 files?

21 A.    Most likely, yes.

22 Q.    Okay.  What were they that you looked for?

23 A.    I looked anywhere where there could be a patient file.

24 Q.    I just excluded patient files.  I don't want to know

25 about patient files.  You've told us about that.  What other

1    files did you look through?

2    **A.**    If there was a stack of papers on a desk, I looked

3    through them.

4    **Q.**    Okay.  What was in those papers that you looked through;

5    or did you?

6    **A.**    I don't recall what was on anything other than I was

7    focused on looking for the evidence that was in attachment B;

8    and if it had a patient file, it got pulled out.  And so if

9    there was a stack of bank records, I may have gone through the

10   bank records looking for patient files --

11   **Q.**    Did you?

12   **A.**    -- or any -- it's been several months and I don't recall

13   exactly which items I viewed with my eyes at that point in

14   time.  But I do know that if I found a patient file that had a

15   patient -- that had BOTOX or JUVÉDERM, I pulled it and I logged

16   it as evidence.

17   **Q.**    All right.  Let's look back at I believe it's Exhibit 4,

18   which is attachment B to the search warrant, item No. 2.  Did

19   you look for any labels, labeling, and advertisements

20   pertaining to misbranded drugs or devices --

21   **A.**    Yes.

22   **Q.**    -- including -- did you?

23   **A.**    I looked for those items, yes.

24   **Q.**    Where did you look for them?

25   **A.**    Anywhere in the building where they could be.

1   Q.    Can you be anymore specific than that?

2   A.    No.

3   Q.    All right.  What were you looking for specifically that

4   would have been a label, labeling, advertisement, magazine,

5   videotape, handout that showed a misbranded drug?

6   A.    Well --

7   Q.    What in particular?

8   A.    -- if it was a label from an invoice or if it was an

9   invoice that showed a purchase of drugs from somewhere, that

10   would be something that I would pull out to show evidence that

11   it might have been from a source that we would want to look

12   further into.  And so labeling --

13   Q.    Was the invoice that you looked for restricted only to

14   BOTOX, JUVÉDERM, or a dermal filler or was it any drug?

15   A.    Any business record related to -- in item 10 on that

16   attachment B, any record, business record, that would be

17   related to the administration or purchase of misbranded drugs

18   was -- I would have been looking for.  So, yes, it -- I don't

19   know how else to tell you, but I would look for anything in

20   that building.  If it was a piece of paper, I would review it

21   and see if it looked like evidence of misbranding; and if it

22   did, I would set it aside.

23   Q.    Was it your understanding that the scope of the search

24   included looking through every business record there on L'Chaim

25   premises that could be found to determine if it dealt with a

1    misbranded drug?

2    **A.**    Yes.

3    **Q.**    Okay.  Did you look for records relating to currency,

4    financial instruments, and other items of value related to

5    misbranded drugs?  Did you look for that?

6    **A.**    I looked for that, yes.

7    **Q.**    Did you find any?

8    **A.**    I do not recall.

9    **Q.**    Where did you look for it?

10   **A.**    Anywhere in the building where those could be kept.

11   **Q.**    Okay.  No. 7, did you look for any trucks,

12   tractor-trailers, or vans for evidence of storing, diverting,

13   loading, or transporting evidence of these crimes?

14   **A.**    Yeah.  We always look for any -- if it's included in

15   attachment B, we look for any vehicles that might be attached

16   to that building to make sure that that's not their off-site

17   storage for illegal products.

18   **Q.**    Was there any evidence in the search warrant affidavit

19   that there were trucks or storage vehicles or trailers or vans

20   that were being used?

21          **MR. PROCTOR:**  Objection, Your Honor.  We're going

22   back to the sufficiency of the warrant.

23          **MR. LYONS:**  I'm not going to the sufficiency of it,

24   I'm just asking for if there was any mention of it.

25          **THE COURT:**  I think we're really going far afield.

1    Mr. Lyons, we've been with this witness about 45 minutes.  At

2    this rate with ten witnesses, we're going to go seven hours and

3    thirty minutes which would take us until about 10:00 tonight.

4              **MR. LYONS:**  I'll finish up.

5              **THE COURT:**  Okay.

6    **Q.**    **(BY MR. LYONS)**  Did you do a search for computer records?

7    **A.**    I did not search the computers.  We have a computer agent

8    who searches the computers.

9    **Q.**    All right.

10             **MR. LYONS:**  I have nothing further of this witness.

11             **THE COURT:**  Redirect?

12             **MR. PROCTOR:**  Yes, Your Honor.

13             **THE COURT:**  Or I'm sorry.  Cross-examination.

14                        **CROSS-EXAMINATION**

15   BY MR. PROCTOR:

16   **Q.**    Agent McCulley, you are not the case agent on this case;

17   correct?

18   **A.**    That's correct.

19   **Q.**    You were not the lead on this search?

20   **A.**    No.

21   **Q.**    Were you part of a team?

22   **A.**    Yes.

23   **Q.**    Who was the leader of that team?

24   **A.**    Special Agent Bain.

25   **Q.**    Okay.  When you're executing a search warrant, is it

1    typical that any every single agent produce a product at the

2    end of it individually, or do they tend to funnel what they

3    find into a single product that then is signed off on by the

4    case agent?

5    **A.**     Yes, that's correct.

6    **Q.**     The latter one is --

7    **A.**     Yes.   Signed off on by the case agent.

8    **Q.**     So you collect things and notes, funnel them up through a

9    system, and then they are eventually taken into evidence if

10   they are found to be pertinent to the investigation?

11   **A.**     That's correct.

12   **Q.**     And, again, who was in charge of that?

13   **A.**     Special Agent Bain.

14   **Q.**     So who would have been most knowledgeable at how or what

15   eventually was taken and seized?

16   **A.**     Special Agent Bain.

17   **Q.**     Okay.   Going back to your role within this, what was your

18   primary role in this whole thing?

19   **A.**     My primary role is to photograph the scene when we

20   arrive.   And throughout the evidence collection, if there is a

21   significant item that is located, I will take a photo of it

22   where it's found, and then to provide a sketch of the -- a

23   diagram of the building so that as we are looking back at the

24   case, we can tell which room the item was taken from.   That was

25   my primary duty.

1  Q.     So you were a player on the team, not the captain;

2  correct?

3  A.     Correct.

4  Q.     All right.

5          MR. PROCTOR:  That's all I have, Your Honor.

6          THE COURT:  Redirect?

7          MR. LYONS:  No, Your Honor.

8          THE COURT:  Very well.  You may step down.  The

9  defendant may call his next witness.

10          MR. LYONS:  Call Matt Kesler.

11          THE COURT:  I don't see Matt Kesler on your witness

12  list.

13              *(Discussion held off the record)*

14          MR. LYONS:  Whoops.  He's not here.  Well, how about

15  Todd Blair?

16          THE COURT:  All right.

17                  *TODD BLAIR*,

18  *after having been first duly sworn, says in reply to the*

19  *questions propounded as follows, to-wit:*

20          THE COURT:  Sir, would you state your full name for

21  the record, please?

22          THE WITNESS:  Todd Blair.

23          THE COURT:  Mr. Lyons, you may inquire.

24          MR. LYONS:  Thank you.

25

1                    DIRECT EXAMINATION

2   BY MR. LYONS:

3   Q.    Mr. Blair, just briefly what's your educational

4   background and your experience with the FDA?

5   A.    Graduated in 1990 with a bachelor's degree from Drury

6   College and I've been an agent with the FDA for 14 years.

7   Q.    In what capacity?

8   A.    Special agent.

9   Q.    Have you ever drafted search warrant affidavits before?

10  A.    Have I what?

11  Q.    Ever drafted a search warrant.

12  A.    Yes.

13  Q.    On how many occasions?

14  A.    Numerous occasions.

15  Q.    And are you familiar with the requirement that search

16  warrants be specific -- or specifically describe the items to

17  be searched for and the things to be seized?

18  A.    Yes.

19  Q.    And do you know what the general reason for that is?

20  A.    Yes.

21  Q.    What's that?

22  A.    It's to seize products that you're actually searching

23  for, items of evidence that you're searching for that you have

24  authorization to seize pursuant to the warrant.

25  Q.    Okay.  And does that also help you understand when to

1   stop the search?

2   **A.**     It just -- basically an affidavit tells you what you're

3   authorized to search for and take.

4   **Q.**     You mean the warrant?

5   **A.**     Correct.

6   **Q.**     Okay.  And in this particular case, did you look at the

7   search warrant affidavit or the search warrant before the

8   search?

9   **A.**     No.

10  **Q.**     Okay.  What were -- did somebody instruct you what it was

11  that you were to search for?

12  **A.**     No.

13  **Q.**     Okay.  So when you went to this premises -- if you'll

14  look at -- there's an exhibit book in front of you.  Look at

15  Exhibit 20 and 21.  Our notes from the information that we --

16  that we have obtained indicate that you and Chuck Barnes were

17  searching center office No. 1.  Do you recall that that's

18  correct or incorrect?

19  **A.**     Where's it on here now?

20  **Q.**     Exhibit 21, room assignment list, item G.

21  **A.**     Yes.

22  **Q.**     Do you recall searching center office No. 1?

23  **A.**     I do recall searching for evidence at the search warrant

24  site.  I don't recall exactly center office.

25  **Q.**     Okay.  What was in the center office that you were

1  searching?

2  **A.**    The only thing I remember, sir, searching for medical

3  records is the only thing I remember searching for.

4  **Q.**    What are medical records?

5  **A.**    Patient records.

6  **Q.**    Okay.  Do you have an explanation for why the search

7  warrant itself didn't say "patient records," it just said

8  "medical records"?

9  **A.**    To me those terms are interchangeable.

10  **Q.**    Okay.  So when you got to center office No. 1, what were

11  you looking for in the patient records?

12            **MR. PROCTOR:**  Your Honor, I think he's

13  mischaracterizing.  I don't think the witness said that he was

14  in center room 1.  He just said he was at the search and could

15  not recall which room.

16            **MR. LYONS:**  All right.

17            **THE COURT:**  Sustained.

18  **Q.**    **(BY MR. LYONS)**  Okay.  When you were searching there,

19  what were you searching for in what patient records?

20  **A.**    I was searching patient records that indicated that BOTOX

21  or other pharmaceutical products were administered to those

22  patients.

23  **Q.**    What other pharmaceutical products?

24  **A.**    Restylane, JUVÉDERM.

25  **Q.**    Anything else?

1   A.   Not that I recall, no.

2   Q.   Do you know how many patient files you went through?

3   A.   No.

4   Q.   Can you give me an estimate?

5   A.   I can't.  I really can't.  There's several.

6   Q.   Were you given any list of patient files, specific

7   patient files, to look through before you went there?

8   A.   No.

9   Q.   Did you search for anything other than patient files?

10  A.   No.

11  Q.   Was there any time limit on the patient files that you

12  looked for?

13  A.   What do you mean time limit?

14  Q.   I mean, all files, for example, after January 1st of 2018

15  or all files from 2015 to '17, was there any time limit?

16  A.   I would have to look at attachment B.  Because my job

17  during the search warrant, as I actually helped execute the

18  search warrant and I was given attachment B, which is items to

19  be seized, and that's what we looked at.  The information in

20  attachment B, that's what I was looking for.

21  Q.   Okay.  As you sit here and testify today, do you recall

22  there being any time limit on --

23  A.   Yes, I do believe there is.  But to confirm that I would

24  actually have to look at attachment B to make sure.  But yes, I

25  do recall that I believe there was a time limit for a certain

1    month, date, and year forward that we were looking for.   That

2    is from my recollection two years ago.

3    Q.    Look at Exhibit 4 in front of you.   Now, I thought you

4    testified -- I thought you started out your testimony by saying

5    that you didn't see the search warrant or the affidavit?

6    A.    I didn't see the search warrant affidavit but I did see

7    attachment B.

8    Q.    All right.   So you saw this -- the actual search warrant

9    attachment B prior to the search or during the search?

10   A.    Prior to the search.

11   Q.    All right.   Take a look at -- I've just put the first

12   page up there, but feel free to look at the entirety of the

13   four pages and tell me if there's a time limit on there that

14   you relied on to limit your search.

15        THE COURT:   I think we can all stipulate and agree

16   there's no time limit; correct?

17        MR. PROCTOR:   Yes, Your Honor.

18        THE COURT:   All right.   Let's move on.

19        MR. LYONS:   All right.   Thank you.

20   Q.    (BY MR. LYONS)   Were there any other limitations that

21   were either described to you or explained to you prior to the

22   search?

23   A.    I can't remember.   I mean, this happened over two years

24   ago and I just -- I remember looking at attachment B.   My job

25   during the search warrant was actually as an interviewer, so I

1   interviewed a patient and then -- or not a patient -- but an

2   employee.  And to help facilitate the people in the search, I

3   ended up helping pitch in and help search the site for some of

4   the items in this attachment B.

5   Q.   Okay.  What areas did you search other than this central

6   room?

7   A.   I can't remember.

8        MR. PROCTOR:  Your Honor, objection again.  He never

9   said that he searched the central room.

10       MR. LYONS:  Well, okay.

11       THE COURT:  Sustained.

12  Q.   (BY MR. LYONS)  All right.  Well, whatever the area was

13  that you searched.  Can you describe the areas that you did

14  search?

15  A.   Where the medical records were kept, the area.

16  Q.   And did you search any employee items?  Did you search

17  employee purses, employee lockers, anything that belonged to

18  specific employees?

19  A.   Not that I recall.

20  Q.   Do you know how long your search lasted?

21  A.   It was for several hours.

22  Q.   Can you be anymore specific than that?

23  A.   I can't.  I don't know.  It should be documented in some

24  reports.  This wasn't my investigation.  I assisted in this

25  investigation so I have no idea if it was four hours or six

1  hours or three hours. I can't recall. I don't remember.

2  Q.    All right. What is your definition of a misbranded drug

3  that you were searching for evidence of?

4  A.    I -- that's a very, very broad question and there's

5  several different forms of a misbranded drug and different

6  definitions of a misbranded drug, and I'm not familiar with the

7  specifics of this case to make that determination.

8  Q.    So when you went in and conducted what part of the search

9  you did, did you have any idea in particular for what evidence

10  you're looking for that would have been proof of a misbranded

11  drug?

12  A.    I wasn't looking for any misbranded drug on this right

13  here. Like I said, I told you before, the limit of my scope

14  was for medical records and that was it.

15            MR. LYONS:  All right. I have no further questions.

16            THE COURT:  Cross?

17            MR. PROCTOR:  Yes, Your Honor.

18                      CROSS-EXAMINATION

19  BY MR. PROCTOR:

20  Q.    Agent Blair, is it safe to say that you conduct a fair

21  number of search warrants?

22  A.    Yes.

23  Q.    In the last two years, have you conducted a fair number?

24  A.    Yes.

25  Q.    Is it possible your memory can get jumbled between

1   different ones sometimes?

2   **A.**    Yes.

3   **Q.**    All right.  But in this case, you are sure about two

4   things, which is that you were -- you were -- you reviewed the

5   attachment B and that you were instructed by your team leader

6   to go through medical records to assist others in their search;

7   correct?

8   **A.**    Correct.

9   **Q.**    Okay.  Now, going back to your actual job in this team --

10  **A.**    Yes.

11  **Q.**    -- because you mentioned you're not the case agent --

12  **A.**    Correct.

13  **Q.**    -- and therefore, not the most familiar with it?

14  **A.**    Correct.

15  **Q.**    You were interviewing people?

16  **A.**    Correct.

17  **Q.**    Okay.  And then I believe you said earlier is it correct

18  to say that you merely assisted by going through medical

19  records and looking for BOTOX, JUVÉDERM, Restylane, and other

20  fillers?

21  **A.**    Yes.

22  **Q.**    Okay.  When you make a search like this, is each agent

23  producing a final product or is it being funneled through the

24  team to create a final product for the agency?

25  **A.**    Yes.

1   Q.    The latter?

2   A.    Yes, the latter.

3   Q.    Okay.  And, again, who is the case agent in charge of all

4  this?

5   A.    Jeremy Bain.

6   Q.    Thank you.

7          MR. PROCTOR:  Nothing further, Your Honor.

8          THE COURT:  Redirect?

9          MR. LYONS:  None, Your Honor.

10         THE COURT:  Very well.  You may step down, sir.  May

11  this witness be excused?

12         MR. LYONS:  He may.

13         THE COURT:  Thank you, sir.  The defendant may call

14  her next witness.

15         MR. LYONS:  Call Agent Dan Allgeyer.

16         DEPUTY COURT CLERK:  Please step forward right over

17  here.

18                   *DANIEL ALLGEYER,*

19  *after having been first duly sworn, says in reply to the*

20  *questions propounded as follows, to-wit:*

21         THE COURT:  Sir, if you would, please state your

22  full name for the record.

23         THE WITNESS:  Daniel John Allgeyer.

24         THE COURT:  Mr. Lyons.

25         MR. LYONS:  I'm sorry?

1    THE COURT:  Yes, sir.  You may inquire.

2    MR. LYONS:  Okay.  Thank you.

3                    DIRECT EXAMINATION

4    BY MR. LYONS:

5    Q.    Agent Allgeyer, how long have you been with the FDA, and

6    give us a little bit of information about your educational

7    background and your law enforcement background, please?

8    A.    All right.  I've been with the FDA-OCI for a little over

9    a four years now.

10   Q.    You can remove your mask, if you'd like.

11   A.    A little over four years with the FDA-OCI.  Prior to

12   that, I was with the United States Secret Service for just

13   about seven years.  Prior to that, I was with the Lenexa,

14   Kansas Police Department as a patrol officer for about three

15   years.  Prior to that, I graduated from the University of

16   Central Missouri.  And I don't know how far back you would like

17   me to go after that.

18   Q.    That's fine right there.  All right.  Have you ever

19   drafted search warrant affidavits before?

20   A.    Yes, sir.

21   Q.    And are you familiar with the requirement that a search

22   warrant specifically describe the items to be searched for and

23   seized?

24   A.    Yes.

25   Q.    Do you understand the difference or do you -- do you

1  understand what I mean by a general warrant?

2  **A.**     I don't.

3  **Q.**     You've never heard that term before?

4  **A.**     Not -- not that I can refer to, no.  Generally warrant is

5  not something I'm familiar with.

6  **Q.**     Okay.  So you don't know about the legal concept or

7  phrase that general warrants are not allowed?

8  **A.**     I have never heard of that, no.

9  **Q.**     Do you understand that warrants have to be limited in

10  scope to the items to be searched for and seized?

11  **A.**     Yes, sir.

12  **Q.**     All right.  Prior to the search warrant being served in

13  this particular case, did you have a copy -- an occasion to

14  read either the affidavit or the warrant itself?

15  **A.**     Yes, sir.

16  **Q.**     And how long prior to the service of the search warrant

17  did you read those items?

18  **A.**     I believe it was the day before.  Not sure.

19  **Q.**     And did you thoroughly acquaint yourself with the

20  information that was contained in the affidavit and in the

21  warrant?

22  **A.**     At the time, yes.

23  **Q.**     And did you all have a meeting prior to the warrant being

24  served where you all discussed how you all were going to serve

25  the warrant, what you were going to search for?

1    A.    Yes.

2    Q.    All right.  Tell me about that meeting.

3    A.    I can only speak in generalities.

4    Q.    Well, tell us generalities then.

5    A.    Generally before a search warrant, we have a search

6    warrant briefing.

7    Q.    Okay.  What was discussed at this one?

8    A.    I don't recall specifics.

9    Q.    Were you told anything in particular about what to search

10   for?

11   A.    Yes.

12   Q.    What were you told to search for?

13   A.    Medical records --

14   Q.    What kind?

15   A.    -- mainly.

16   Q.    I'm sorry?

17   A.    Mainly medical records.  There was a number of other

18   items we can search for, but medical records was what we were

19   told to key off of.

20   Q.    Okay.  What constitutes medical records?

21   A.    Those records held by a doctor or practitioner to

22   establish the care of a patient.

23   Q.    So they were patient records or some other kind of

24   records?

25   A.    I'm not sure what you're asking.

1   **Q.**   I don't know how to make it more clear. Did you limit

2   yourself to patient records or were there other medical records

3   you looked at other than patient records?

4   **A.**   I believe -- I looked at medical records from patients,

5   yes.

6   **Q.**   All right. Did you look at -- whatever it is you call

7   medical records, were there any medical records that were

8   nonpatient medical records that you looked at?

9   **A.**   That I looked at, no.

10   **Q.**   All right. Was there -- was there any -- let me back

11   up.

12         How did you know what patient records to look at?

13   **A.**   They were in files. They were in the file cabinets.

14   **Q.**   Okay. What were you looking for in terms -- well, what's

15   your definition of a misbranded drug that you were looking for

16   evidence of in relation to this case?

17   **A.**   We were looking at patient files for those patients that

18   had received BOTOX or fillers.

19   **Q.**   Why just BOTOX or fillers?

20   **A.**   That was what was on the warrant.

21   **Q.**   Where's does it say on here to look for BOTOX on

22   attachment B?

23   **A.**   I -- is it in front of me?

24   **Q.**   It's in front of you, Exhibit 4. and it's here on the

25   screen. If I'm mistaken, maybe counsel for the government can

1  point out to me that the attachment B specifically says BOTOX

2  or JUVÉDERM.

3          Does it say that on there, to your knowledge, Agent

4  Allgeyer?

5  **A.**     I'm not seeing it on this part of the paper, no.

6  **Q.**     All right.

7          **MR. LYONS:**  Ms. Cozzoni, do you know if the mention

8  of BOTOX or JUVÉDERM is listed in attachment B so we can cut to

9  the chase here?

10         **MR. PROCTOR:**  Well, Your Honor, I believe BOTOX is a

11  drug, and thus in the Venn diagram, the circle of BOTOX falls

12  completely inside the circle of drug.  So by definition of

13  having "drug" in there, it would in fact include BOTOX.

14         **THE COURT:**  And I'd appreciate Mr. Lyons and all

15  counsel to direct questions to me rather than directly to

16  opposing counsel.

17         **MR. LYONS:**  All right.

18         **THE COURT:**  But I think we can all stipulate here

19  that the words "BOTOX" and/or "fillers" are not attachment B;

20  correct?

21         **MR. PROCTOR:**  Yes, Your Honor.

22         **THE COURT:**  All right.  Go ahead.

23         **MR. LYONS:**  Thank you.

24  **Q.**     **(BY MR. LYONS)**  All right.  So what other -- what other

25  drugs or items, instrumentalities, fruits for violations of 21

1    U.S.C. 331 were you looking for other than BOTOX or JUVÉDERM?

2    A.    I don't recall any of those.

3    Q.    Okay.  So what was it about a patient file that you were

4    -- that you were looking for to determine that BOTOX or

5    JUVÉDERM was a misbranded drug?

6    A.    Can you ask -- can you repeat that question again?

7    Q.    Well, let me see if I can ask it another way.

8         Did you just simply pick up every patient file that had

9    BOTOX or JUVÉDERM in it and seize that?

10   A.    We picked up every patient file that had BOTOX or

11   JUVÉDERM in there, yes.

12   Q.    All right.  But you had to go through all the other files

13   there to search through them to determine the ones that did or

14   didn't have BOTOX and JUVÉDERM in them; right?

15   A.    Correct.

16   Q.    All right.  Was there any time limit on the search for

17   the patient records you were looking at?

18   A.    I don't recall.

19   Q.    Now, my understanding here, Agent Allgeyer, is that one

20   of the reasons -- excuse me -- one of the factual allegations

21   here is that these drugs were misbranded because Ms. Sanders

22   lost her -- or her license was suspended in September of 2016,

23   if I recall correctly.  Do you recall that?

24   A.    I don't know anything about that.

25   Q.    So you didn't limit your search for patient records after

1    September of 2016?

2    **A.**    I don't remember a time frame given, anything like that.

3    **Q.**    Would that have been important to you to know that fact?

4    **A.**    Possibly.

5    **Q.**    Did you search for and seize anything other than patient

6    records?

7    **A.**    I did not, no.

8    **Q.**    All right.  And where were the areas that you looked?

9    **A.**    There was some file cabinets in the back of the business.

10   There were some file cabinets in the front of the business.

11   Most of the files were in those two areas but I believe there

12   was some files scattered throughout.

13   **Q.**    Sir, if you would look at Exhibit 20 and tell me which

14   one of those rooms are the -- or you can look at 21 in

15   conjunction with it and tell me which one of those are the

16   backrooms that you searched.

17   **A.**    So D was one of the rooms we searched -- that I searched.

18   M was another room.

19   **Q.**    I'm sorry.  The first one was what?

20   **A.**    D as in "David."

21   **Q.**    D as in "David."  Okay.

22   **A.**    Another one was M as in "Mike."  That's all the ones I

23   can recall specifically.  Again, there could have been files in

24   other places but those two come to mind.

25   **Q.**    Describe for me what was in room D.

1    **A.**    D was -- is notified as file room.

2    **Q.**    All right.  Look at -- look at Exhibit 25, if you would.

3    Do you see that letter "D" on a piece of paper?

4    **A.**    Yes, sir.

5    **Q.**    Was that put up in the file room labeled "D"?

6    **A.**    I don't know.

7    **Q.**    If it was, you didn't see it?

8    **A.**    I don't know if this was put up in the file room.

9    **Q.**    All right.  Do you know when your search of room D

10   started?

11   **A.**    I don't.

12   **Q.**    Do you know when it ended?

13   **A.**    Not from memory, no, I don't.

14   **Q.**    Do you know how many patient files you looked through

15   before you found ones with BOTOX or JUVÉDERM in them?

16   **A.**    How many I got through before I found the first one?

17   **Q.**    Yes, sir.

18   **A.**    Probably the first one.

19   **Q.**    All right.  And do you know that for a fact or is that

20   just a --

21   **A.**    It was near the front, if not the front.

22   **Q.**    How many other patient files did you then look through to

23   determine which ones to separate out because they had BOTOX and

24   JUVÉDERM and the other ones didn't?

25   **A.**    I would say it would have to be in the hundreds.

1   Q.   Now, I think I've seen a photograph that there are three

2   -- would there have been as many as ten file cabinets with four

3   drawers each in room D?

4   A.   That sounds about right.

5   Q.   How many other people were searching in room D other than

6   you?

7   A.   I don't know how many.

8   Q.   Okay.  Would you look at -- take these exhibits kind of

9   between your fingers, 8 to 18, and look through those and

10  you'll see long lists of patients, and will you tell me if you

11  recognize those or recognize any of the handwriting on them as

12  being yours?

13  A.   I don't recognize any of this so far -- I'm at 12 right

14  now -- as being mine.  Going on to 15, still no.  17 looks

15  relatively familiar to my handwriting but I'm not sure,

16  couldn't be sure.

17  Q.   I know some people's handwriting is so bad that they

18  can't figure out if it's theirs or not.  Are you telling me

19  that's the situation here?

20  A.   I am.  I couldn't tell you.  We don't normally sit down

21  at a desk where it's comfortable to write those things.

22  Q.   All right.

23  A.   So, yeah, I can't be sure.

24  Q.   On Exhibit 17 up at the top, it says item 5, 8 of 9, and

25  with box 11.  Do you know what that referencing -- that

1    reference system means?

2    **A.**    I would assume it means evidence box 11, item 5, 8 of 9.

3    I don't -- just from looking at it offhand, I wouldn't know.

4    **Q.**    Okay.  How long were you there searching that day at

5    L'Chaim?

6    **A.**    More than an hour.

7    **Q.**    How much longer than an hour?

8    **A.**    I don't recall.  Been awhile.

9    **Q.**    Well, I've seen some indications that searches went as

10   late as 1650 hours.  Were you there that late?

11   **A.**    I would imagine, yeah, I probably stayed to the end.

12   **Q.**    Okay.  So if it started at 10:00, then you may have been

13   there until 4:00 or 5:00 p.m.?

14   **A.**    Okay.

15   **Q.**    That's a question.

16   **A.**    If I was there for the last part of it, then, yeah,

17   that's -- I do recall staying there to the end.

18   **Q.**    And did you search for anything, other than patient

19   files, that after you went through them you looked in them and

20   made a determination as to whether the patients had been either

21   prescribed or injected with BOTOX or JUVÉDERM?  Did you seize

22   any other items other than that?

23   **A.**    No.    That's what I was tasked with.

24   **Q.**    Okay.  And did you search for any computers or computer

25   files?

1    **A.**    No, I did not.

2    **Q.**    Business records?

3    **A.**    No, I don't think I did.

4    **Q.**    Trucks?

5    **A.**    Trucks?

6    **Q.**    Yeah, trucks.

7    **A.**    No, I didn't search for a truck.

8    **Q.**    Vans?

9    **A.**    No, sir.

10    **Q.**    Look at -- were you instructed to only look through

11    patient files?

12    **A.**    I think that was my specific instruction, yes.

13    **Q.**    And is it also fair to say that your goal was to look in

14    patient files to see if BOTOX or JUVÉDERM was mentioned; and

15    then if so, you grabbed that file and you put it in a pile for

16    somebody else to look at later?

17    **A.**    That's fair, yes.

18    **Q.**    Do you know what a fruit or instrumentality of a crime

19    is?

20    **A.**    Yes, sir.

21    **Q.**    What is it?

22    **A.**    That which is received from another crime or -- the

23    current definition, I don't know.  But I understand the

24    concept.

25    **Q.**    Explain the concept -- explain the concept of looking for

1  a fruit or instrumentality of a crime that you -- that you did

2  out there when you served this search warrant.

3  **A.**      Something that could contain evidence of a crime,

4  something that would become evidence of the crime.

5  **Q.**      And what were those things that were fruits or evidence

6  -- or instrumentalities of a misbranded drug that you looked

7  for other than patient files?

8  **A.**      I believe patient files were the only thing I looked for,

9  sir.

10  **Q.**      Okay.

11              **MR. LYONS:**   Nothing further.

12              **MR. PROCTOR:**   We have no cross of this witness, Your

13  Honor.

14              **THE COURT:**   Let me ask:  Do you recall, was there

15  anything that helped identify whether a particular file

16  involved BOTOX or JUVÉDERM?

17              **THE WITNESS:**   Yes, sir.  Some of them actually had

18  BOTOX labeling and/or the notification of BOTOX being

19  administered on a patient.  That was mostly what we were

20  looking for, BOTOX, JUVÉDERM, fillers, something like that in

21  the patients files saying that this patient received treatment.

22              **THE COURT:**   Given the volume of files, how were you

23  able to do that in an expeditious manner?

24              **THE WITNESS:**   They were generally located at either

25  the first page or one of the front pages, so it didn't take

1  long to flip through the first couple pages or open the file

2  completely to see evidence that this patient had been

3  administered the filler or BOTOX.

4          **THE COURT:**  All right.  Thank you very much.  May

5  this witness be excused?

6          **MR. LYONS:**  Yes, Your Honor.

7          **THE COURT:**  All right.  We need to take a break.

8  We'll take a ten-minute recess.

9                      *(Short break)*

10          **THE COURT:**  The defendant may call her next witness.

11          **MR. LYONS:**  Call Agent Bain.

12          **THE COURT:**  Agent Bain, I'll simply remind you that

13  you remain under oath.  If you'll verbally acknowledge that,

14  sir.

15          **THE DEFENDANT:**  Yes, sir, I do.

16          **THE COURT:**  Very well.  Be seated.  Mr. Lyons,

17  cross-examination.

18          **MR. LYONS:**  Thank you.

19                 **CROSS-EXAMINATION**

20  BY MR. LYONS:

21  Q.   Agent Bain, did you draft the affidavit for the search

22  warrant in this case?

23  A.   Yes, sir, I did.

24  Q.   Did you cut and paste any of that from any other

25  affidavits there were, or did you draft all this just from the

1    beginning?

2    **A.**      There is some cut and pasting that's involved, yes.

3    **Q.**      And can you cite us to those paragraphs by chance that

4    are cut and pasted?

5                **MR. PROCTOR:**   Objection, Your Honor, to relevance.

6    He adopted it when he submitted it to the magistrate.

7                **THE COURT:**   Sustained.  But you can rephrase.

8                **MR. LYONS:**   Okay.  I couldn't hear counsel.  He

9    mumbled -- I hate to say a word was muffled but there was a

10   word muffled.

11               **MR. PROCTOR:**   Your Honor, my objection was to the

12   relevance of whether or not it was cut and pasted because he

13   adopted it when it went to the magistrate.

14               **THE COURT:**   These masks do present a problem.  Go

15   ahead.  The objection's sustained and you may rephrase.

16   **Q.**   **(BY MR. LYONS)**  All right, sir.  Look at Exhibit 1 in

17   front of you, please, page 1.  Do you see paragraph 2 there?

18   **A.**      Yes, sir.

19   **Q.**      All right.  Is it fair to say that paragraph 2 summarizes

20   your allegations of believed criminal activity for which you

21   were seeking a search warrant?

22   **A.**      Yes, it does.

23   **Q.**      And that is, I think, later on in your -- in the

24   affidavit, you specifically mention -- I'm going to look in the

25   same exhibit there, page 18, paragraph 98.  Now, there was --

1  and there's obviously a number of paragraphs here before this

2  -- but the essence of why you were seeking a search warrant was

3  because you believed that Ms. Sanders, because her nursing

4  license had been suspended and because doctors weren't having

5  sufficient time with the patients, that if Ms. Sanders

6  prescribed prescription drugs under those circumstances, then

7  that would constitute misbranded drugs as defined in 21 U.S.C.

8  Section 352(f)(1) -- is that accurate? -- and 353(b)(1).  I

9  didn't mean to leave that out.

10 **A.**    What you said is accurate, except for she would not have

11 had any prescribing privileges whether she was a nurse or not.

12 **Q.**    Okay.

13 **A.**    So her administration of those products would have been

14 misbranded without the doctor's involvement.

15 **Q.**    Okay.  But did you have any -- well, let me back up.

16        In some of the paragraphs, 48 to 94, you mention -- and

17 I'm going to summarize this; but if you disagree with it, you

18 tell me.  There's an indication of six patients --

19               **THE COURT:**  I think there are eight, are there not?

20               **MR. LYONS:**  Were there eight?

21               **THE COURT:**  I just counted them.

22               **MR. LYONS:**  Okay.  If I -- hang on.  You're right.

23 So there are eight patients.

24 **Q.**    **(BY MR. LYONS)**  All right.  Some of those patients saw

25 the doctors and some didn't; right?

1  **A.**     That's correct.

2  **Q.**     And but your allegations of misbranded drugs then deal

3  with the quality of the time spent with the doctor and the

4  patient.  Do you agree with that?

5  **A.**     There was a question about whether or not a doctor had a

6  proper relationship with the patient.

7  **Q.**     Okay.  What kind of proper relationship does a doctor

8  have to have to diagnose somebody that they've got crow's feet

9  and they could have BOTOX?

10  **A.**     More than a thirty-second interaction.

11  **Q.**     Based on what?  In other words, is there a statutory

12  definition for what constitutes a sufficient patient-physician

13  relationship?

14  **A.**     That's a question that's probably better answered by the

15  Oklahoma Medical Board investigator.

16  **Q.**     All right.  And do you know what the diagnostic criteria

17  are for the administration of BOTOX or JUVÉDERM?

18          **MR. PROCTOR:**  Objection, Your Honor.  I think we're

19  getting -- looping right back to the sufficiency of the

20  warrant.

21          **THE COURT:**  We are.  Sustained.

22          **MR. LYONS:**  Okay.  I'm not trying -- never mind.

23  I'll move on.

24  **Q.**     **(BY MR. LYONS)**  All right.  The crime -- or excuse me.

25  What you have alleged in the search warrant affidavit, which is

1  Exhibit 1, page 1, paragraph 2, is simply dispensing

2  prescription drugs to clients without a valid prescription and

3  then receiving misbranded prescription devices in interstate

4  commerce.  Did I fairly summarize that?

5  **A.**   Yes.

6  **Q.**   Is there any allegation of fraud there?

7  **A.**   Not in that paragraph.

8          **MR. PROCTOR:**  Objection, Your Honor.  Again, we've

9  already covered that -- where I suspect this is going is the

10 ground already covered by the affidavit.

11         **THE COURT:**  Sustained.  As I set forth in the order,

12 we're focused today on the scope of the search and the

13 methodology and search protocol applied to the search to

14 determine whether or not the patient records seized exceeded

15 the scope of the search warrant.  So the objection's sustained.

16         **MR. LYONS:**  May I be heard briefly on that?

17         **THE COURT:**  Yes, sir.

18         **MR. LYONS:**  All I'm trying to do is establish a

19 basis for that and the limitations with regard to the scope of

20 the search.  And if I may ask -- I'll ask -- if I may ask a

21 couple more questions along that line, I think my point will be

22 made clear.

23         **THE COURT:**  All right.  Go ahead.

24 **Q.**   **(BY MR. LYONS)**  All right.  What you have set forth in

25 the search warrant affidavit, page 1, paragraph 2, is what kind

1   of crime, please?

2   A.    I'm sorry.  Did you ask a question as you walked away?

3   Q.    Sure.  What kind of crime have you set forth there that

4   you believe has occurred for which there will be evidence when

5   you search?  What kind of crime?

6           THE COURT:  Once again, I mean, I've ruled that

7   there was probable cause and that the agents relied on good

8   faith -- in good faith on the search warrant that was signed by

9   the federal magistrate judge.

10          MR. LYONS:  May I state the point that I'm trying to

11  make here, Your Honor?

12          THE COURT:  Please, because I'm really not following

13  you.  It seems to me that we're well afield of scope of search.

14  Go ahead.

15          MR. LYONS:  All right.

16  Q.    (BY MR. LYONS)  Did the crime described under Section

17  331(c), receipt in interstate commerce of a misbranded drug,

18  and the punishment for which is a misdemeanor, isn't that what

19  you're describing in that paragraph, a simple misdemeanor

20  crime?

21  A.    I'm not sure what your question is.

22  Q.    Is that -- have you set forth a description of the crime

23  of receipt of a misbranded drug under 331 -- 21 U.S.C. Section

24  331 -- that is a misdemeanor which is punishable by up to one

25  year?

1    **MR. PROCTOR:**  Objection, Your Honor.  He's not a

2  lawyer on the stand, and I think it's a mischaracterization of

3  the potential penalty for the crime which depends on the mens

4  rea.

5    **THE COURT:**  We're limited here -- pursuant to the

6  order that this court entered, we're limited to -- let me get

7  the order in front of me.  This hearing is limited in scope to

8  the discrete issue of whether executing officers exceeded scope

9  of the warrant.

10   If Mr. Lyons persuades the court that the only crime

11  for which the defendant can be prosecuted here is a

12  misdemeanor, then we can address that at pretrial and trial.

13  But this hearing, once again -- and I quote page 14 of document

14  60 -- is limited in scope to the discrete issue of whether

15  executing officers exceeded the scope of the warrant.

16   So the objection's sustained.  Go ahead.

17  Q.   **(BY MR. LYONS)**  Did the search warrant itself authorize

18  you to search for any wire fraud or mail fraud crimes?

19  A.   Not specifically.

20  Q.   Well, you realize a search warrant is supposed to tell

21  you specifically what to search for; right?

22  A.   It outlines potential violations that have been

23  identified in the affidavit.

24  Q.   Well, did you limit your scope of the search to those

25  items and the evidence set forth on page 1, paragraph 2, or did

1    you also search for evidence of mail fraud and wire fraud when

2    you were executing the search warrant?

3    A.    We limited the scope of our search to the items listed on

4    the attachment B of the warrant.

5    Q.    Okay.  Did you also confine the scope of the search to

6    those items to the crimes that are set forth in paragraph 2?

7    A.    The crimes that you're referencing in paragraph 2, that's

8    part of the whole investigation.

9    Q.    All right.  Were computer records or computer hard drives

10   or any computers seized?

11   A.    Images of their likeness were seized.

12   Q.    I'm sorry?

13   A.    Images of their likeness were seized.

14   Q.    I don't understand what that means.

15   A.    That means we did not physically take the computers with

16   us.  We brought in hard drives and mirrored the computers

17   on-site and took the mirrored copy with us.

18   Q.    Did you take everything from every hard drive on every

19   computer.  I say take it.  Did you copy it?

20   A.    I can't speak to that.

21   Q.    Well, who could?

22   A.    The agent that did the computer imaging.

23   Q.    Okay.  But we've heard in great detail how you were the

24   case agent on this and you were the one to instruct people.

25   Did you tell your computer expert or did you limit him in any

1  way to the information he was to take off of the computer hard

2  drives?

3  A.     His directions of what he can take is outlined in the

4  attachment B --

5  Q.     Okay.  But I'm -- did you have conversations with the

6  agent that did the computer searches?  Did you have a

7  conversation with him before the search?

8  A.     I did.

9  Q.     Okay.  Did you limit him in any way in what he was to

10 copy off of those computer hard drives?

11 A.     I don't recall having a specific conversation to that

12 matter.

13 Q.     All right.  You've looked at the information on the

14 computer hard drives, have you not?

15 A.     I have looked at the information provided by the agent

16 that did the forensic analysis, yes.

17 Q.     Okay.  And was the forensic analysis in any way limited

18 by date or time range?

19 A.     I don't believe so.

20 Q.     All right.  Was it limited in any way by a search term

21 for BOTOX?

22 A.     Where that's all they looked for is what you're asking?

23 Q.     Well, yeah.

24 A.     I don't know specifically how the search was conducted.

25 Q.     Okay.  So is it your understanding as the case agent that

1   every computer hard drive -- the entirety of every computer

2   hard drive was copied and taken back to someplace for forensic

3   analysis and at that point then people went through it and

4   determined what might be relevant and what might not be

5   relevant?  Is that a fair statement?

6   **A.**     I'm not familiar with how they conduct their searches to

7   make it -- whether they take everything or if they can pick and

8   choose what they take off of there.

9   **Q.**     Well, look at the search warrant, if you would, which is

10  -- I believe it's Exhibit 4, starting on page 2.  Do you see it

11  there on the screen?

12  **A.**     Yes, sir.

13  **Q.**     And it indicates -- if I'm reading it correctly, it says

14  "relating to computer-generated records, such records include."

15  Is there any limitation in subparagraph (a) of a search for a

16  particular date range for BOTOX, for JUVÉDERM, or for a filler?

17  **A.**     I do not see anything that speaks to those items

18  specifically.

19  **Q.**     All right.  And I'm trying to make this kind of quick.

20  Will you go down through there and see if there are any

21  limitations in paragraphs B, C, D?  Do you see any of those

22  limitations?

23          **THE COURT:**   There are no time limitations.   I think

24  we've already established that here; correct?

25          **MR. PROCTOR:**   Yes, Your Honor.

1    **MR. LYONS:** All right.

2    **THE COURT:** And while it's on my mind here, I'm

3    looking back to page 6 of docket No. 60, where we addressed

4    Mr. Lyons' argument for suppression because the warrant sought

5    evidence of violations of 21 U.S.C. Section 331 but she's not

6    been charged under that statute. The same goes for the

7    question with regard to wire fraud.

8         But the court on page 6 recites the U.S. Supreme Court

9    case, *Bordenkircher v. Hayes,* wherein the U.S. Supreme Court

10   says that it's well-established that so long as the prosecutor

11   has probable cause to believe that the accused committed an

12   offense defined by statute, the decision whether or not to

13   prosecute and what charge to file or bring before a Grand Jury

14   generally rests entirely in his discretion.

15        Moreover, Mr. Lyons is focusing on paragraph 2 of the

16   affidavit, but attachment B of the search warrant, as I discuss

17   in the order, sought items which constitute evidence, fruits,

18   and instrumentalities of violations of federal law, including,

19   but not limited to, violations of 21 U.S.C. Section 331 --

20   there should have been a comma thereafter; it was omitted --

21   but for the receipt and distribution of misbranded drugs and

22   devices. That's why we're not getting into that here.

23        You wanted to say something, Mr. Proctor?

24        **MR. PROCTOR:** No, Your Honor.

25        **THE COURT:** Okay. Go ahead, Mr. Lyons.

1    MR. LYONS:    Thank you.

2    Q.    (BY MR. LYONS)    Agent Bain, if you'll look over on page 3

3    of the search warrant -- and I'm going to summarize this -- but

4    does it indicate in paragraph 13 -- and I'll just read it real

5    quickly -- "in order to search for data that is capable of

6    being read or uninterpreted by a computer, law-enforcement

7    personnel may need to seize and search the following items:

8    Any computer equipment and storage device capable of being used

9    to commit, further, or store evidence of crimes, including, but

10   not limited, to the purchase, receipt, possession, storage,

11   sale, and/or administration of misbranded drugs or devices in

12   violation of 21 U.S.C. 331"?  Did you read that accurately?

13   A.    Yes, sir.

14   Q.    Is there any other mention on page 3 or 4 of misbranded

15   drugs?

16   A.    What tab are you on, sir?

17   Q.    It is tab 4, the actual search warrant.

18   A.    Four for me is attachment B.

19   Q.    Well, I know.  It's attachment B to the search warrant.

20   A.    Okay.

21   Q.    Do you not recognize that?

22   A.    I didn't -- I wasn't finding it in the book.  I was just

23   looking for clarification.  I found it now.  Can you ask your

24   question again, please?

25   Q.    Sure.  On page 3 and 4 of attachment B to the search

1    warrant, is there any indication of misbranded drugs other than

2    that one line under paragraph 13?

3    **A.**    I do not see a mention of that.

4    **Q.**    And is it fair to say that that part of the search

5    warrant just says, law-enforcement officers, here are all the

6    items you get to search for that may contain misbranded drugs?

7    Is that the way you read that?

8    **A.**    Yeah.  I think it -- this is language provided by our

9    forensics unit of items that they've come across in likely

10   previous warrants that they would need access to in order to do

11   a complete search of the electronic devices on-site.

12   **Q.**    Was this cut and pasted from another search warrant into

13   this when you drafted it?

14             **MR. PROCTOR:**  I renew my objection, Your Honor.  I

15   don't think it's relevant given that he adopted it upon

16   submission to the magistrate.

17             **MR. LYONS:**  I'm trying to -- I'm trying to

18   understand if this is particularized to this case or if this is

19   just the same cut-and-paste they do for every warrant.

20             **MR. PROCTOR:**  Renew my objection, Your Honor.  Your

21   Honor, the court has dealt with the particularity question, and

22   the overarching phrase at the beginning once modified under the

23   good faith exception covers every following item particularized

24   enough for the Fourth Amendment.

25             **THE COURT:**  Yeah.  I think we're trying to, once

1   again, divert away from whether or not the executing officers

2   exceeded the copy of the warrant.  It would appear to me,

3   Mr. Lyons, that you're attacking the sufficiency of the

4   warrant, and correct my impression if I'm wrong.

5          **MR. LYONS:**  I'm pointing out the generality of it,

6   Judge, that there are no limits.  There are no limits.  So when

7   you talk -- when I understood your order to say, we're going to

8   deal with the execution of the warrant, if the warrant has no

9   limits on it and the officers are relying on what I believe is

10  a warrant without limitation by subject matter, by patient, by

11  drug, by anything, to me that is relevant information and

12  evidence to show that these agents, as we've heard testimony

13  from these people, they went and searched every file there was.

14  Nobody has indicated any sort of limitation on the search such

15  that when they found something the search was over.

16         **MR. PROCTOR:**  Your Honor, may I explain what the

17  government thinks we are discussing in this hearing?

18         **THE COURT:**  Go ahead.

19         **MR. PROCTOR:**  So I believe what Mr. Lyons is doing

20  is revisiting the particularity of the warrant, which does go

21  to its sufficiency, because the warrant under the Fourth

22  Amendment is required to be sufficiently particular to guide

23  the agents.  The scope -- the scope of the execution is

24  separate from that.  The decisions -- Your Honor's decision has

25  said it is sufficiently particular.  The question now is, when

1    they went in there, did they honor the terms of the

2    particularized attachment B to the warrant.

3              THE COURT:   And that's how I'm seeing it as well.

4         And frankly, Mr. Lyons, I mean, to try to boil this

5    down, at least from the testimony that I've heard, is that

6    basically they're opening these files to see if they see a

7    diagram of the face where injectables were injected and they're

8    putting those specific files aside.   So that's what we're

9    getting into as to the execution and whether they exceeded the

10   scope of the warrant itself.

11        The objection's sustained.   Go ahead.

12             MR. LYONS:   May I be heard on just one quick issue?

13             THE COURT:   Please.

14             MR. LYONS:   On page 10 of document 60, you made a

15   ruling that "thus the warrant is not limited to evidence of any

16   particular crime is therefore facially overbroad."

17             THE COURT:   Yes.   But then we -- because the comma

18   was omitted, and that's when we went into the good faith

19   exception on pages 10 through 14.   So the good faith exception,

20   in my view, saves the warrant.   So we're no longer looking at

21   the warrant itself but whether or not they properly executed or

22   whether they exceeded the scope of the warrant.

23             MR. LYONS:   All right.

24             THE COURT:   All right.   You may be arguing to the

25   Tenth Circuit about a comma and that's fine.   I mean, I thought

1   the comma was important.  They may -- they may tell me I'm all

2   wet.  But I suspect that you guys are going to get a trip to

3   Denver over this.  Go ahead.

4           **MR. LYONS:**  Well, I'd defend you if they said you

5   were all wet because I don't believe it.

6           **THE COURT:**  They've told me I'm all wet before and

7   they probably will again.

8   **Q.**   **(BY MR. LYONS)**  All right.  Agent, on Exhibit 4,

9   attachment A to the search warrant -- and it's actually -- it's

10  on the second page.  It's kind of on the back of Exhibit B.

11  That's just the way it copied.  Have you got it there in front

12  of you?

13  **A.**   It's in attachment A in Exhibit 3.

14  **Q.**   Whoops.  Excuse me.  All right.  Exhibit 3 is the real

15  copy of it, attachment A.  Have you got that there in front of

16  you?

17  **A.**   Yes, sir.

18  **Q.**   All right.  So you were to search the premises at L'Chaim

19  for evidence of what, please?  Read it out loud, please.

20  **A.**   For evidence of fruits and instrumentalities of

21  violations of Title 21, United States Code, Section K.

22  **Q.**   What's Title 21, Section K?

23  **A.**   I do not know off the top of my head.

24  **Q.**   All right.  Thank you.  Did you instruct the agents to

25  search for BOTOX specifically?

1  **A.**    It was one of the items that I covered in my briefing

2  that would likely be located within the premises.

3  **Q.**    So is that a "yes"?

4  **A.**    Yes.

5  **Q.**    Did you tell them specifically to look for and search for

6  BOTOX?

7  **A.**    Not limited to BOTOX.

8  **Q.**    Just did you tell them to look for BOTOX?

9  **A.**    Yes.

10  **Q.**    Did you find any?

11  **A.**    Not in its physical form, no.

12  **Q.**    I'm sorry.  What does that mean?

13  **A.**    That means we did not find any physical evidence of

14  BOTOX; we found records associated with BOTOX.

15  **Q.**    Okay.  So did you find any BOTOX vials?

16  **A.**    No.

17  **Q.**    Boxes?

18  **A.**    No, sir.

19  **Q.**    Package inserts?

20  **A.**    No, sir.

21  **Q.**    All right.  Did you find any -- did you tell the agents

22  to specifically look for JUVÉDERM?

23  **A.**    Again, it was another item that was identified as to look

24  for.

25  **Q.**    So the answer's "yes"?

1    **A.**    Yes.

2    **Q.**    Okay.  And did you find any JUVÉDERM?

3    **A.**    No, sir.

4    **Q.**    Or boxes?

5    **A.**    No, sir.

6    **Q.**    Or package inserts?

7    **A.**    No, sir.

8    **Q.**    And did you tell them to look for any other specific

9    drugs, or did you tell them -- did you instruct them to look

10    for drugs from any other manufacturer other than Allergan?

11            **MR. PROCTOR:**  Objection, Your Honor.  It's a

12    compound question, be difficult to answer.

13            **THE COURT:**  Sustained.  Rephrase, please.

14    **Q.**    **(BY MR. LYONS)**  Okay.  Did you ask the agents to search

15    for any drugs other than those manufactured by Allergan?

16    **A.**    Yes.

17    **Q.**    Okay.  What other drugs did you specifically instruct

18    them to search for?

19    **A.**    Restylane.

20    **Q.**    And who was that made by?

21    **A.**    Galderma.

22    **Q.**    Galderma.  Okay.  Was there any other drug that you

23    specifically instructed the agents to look for other than

24    BOTOX, JUVÉDERM, and Galderma?

25    **A.**    I don't think so.

Q.    How many different drugs were administered there at this location other than JUVÉDERM, BOTOX, and Galderma?

A.    I don't know that.

Q.    Well, you saw the patient records, didn't you?

A.    Some I did.

Q.    Okay.  Were there drugs, other than BOTOX, Galderma, and JUVÉDERM, that were administered?

A.    There was.  But I don't know the exact number of what other products were offered.

Q.    Okay.

        MR. PROCTOR:  Just quickly, Your Honor.  If I may, I think when he says "Galderma," it's the company.  Mr. Lyons means to refer to Restylane, which is the device.

        MR. LYONS:  Fair enough.  I'll accept that.

        THE COURT:  Thank you.

Q.    (BY MR. LYONS)  Okay.  So there were drugs, other than Restylane and BOTOX and JUVÉDERM, that were administered, but you didn't pay attention to those, you didn't log those, you didn't conduct any further search on those?  Is that a fair statement?

A.    I don't recall if we seized -- or if we -- I don't recall if I followed up with manufacturers other than the three you just listed.

Q.    Well, there's just two; right?

A.    True, yes.  Two manufacturers, three products that you

1 listed.

2 **Q.** But if Ms. Sanders had lost her -- or had her license

3 suspended and if she was administering any prescription drug

4 without proper supervision by a physician, then under your

5 theory of a misbranded drug that, too, would constitute a

6 crime; correct?

7 **A.** It would fall under the same definition, yes.

8 **Q.** But you didn't even look for any evidence of that in the

9 other patient records that you discarded or that were discarded

10 by the people searching, did you? Didn't happen, did it?

11 **A.** It wasn't our primary focus.

12 **Q.** Wasn't your focus at all, was it?

13 **A.** The evidence at that point had highlighted the use of the

14 three products that we've discussed.

15 **Q.** But if you're looking for evidence of misbranded drugs,

16 as defined in this particular case, because an unlicensed RN

17 without proper supervision is administering them, then your

18 duty to search would go to all the drugs and not just those

19 Allergan drugs or Restylane; fair?

20 **MR. PROCTOR:** Objection, Your Honor. I suspect that

21 Mr. Lyons can correct me, but you've already ruled on the BOTOX

22 police defense and -- because right now what he's presenting

23 seems to cut against what is his argument that this is an

24 overbroad search, because he's actually drawing out that it's a

25 narrower search than it could have been. So I suspect what

1  he's trying to lead back to is something again Your Honor's

2  already ruled on.

3             THE COURT:  Response?

4             MR. LYONS:  That's kind of a speaking objection,

5  isn't it, Judge?

6             THE COURT:  Well, it speaks to a question that I had

7  in my mind as you were asking it.

8             MR. LYONS:  Well --

9             THE COURT:  So any response?

10            MR. LYONS:  I'm not going to the BOTOX police.  What

11 I'm trying to do is -- look, if the search warrant directs him

12 to look for proof of misbranded drugs and if he is faithfully

13 executing the search warrant, one way of defining a proper

14 search for this is to say, well, if you're looking there for

15 misbranded drugs, you've got a duty to look for all misbranded

16 drugs, not just BOTOX, JUVÉDERM, or Restylane.

17            I submit, Your Honor, that when he didn't look at the

18 search warrant for evidence of misbranded drugs, that it's a --

19 that it is not an accurate description of the terms of the

20 search for him to say, well, look, up at the top of Exhibit B,

21 you know, throw out that paragraph, yeah, I was just looking

22 for terms -- or I was looking to search for items of misbranded

23 drugs.  What he was looking for was just BOTOX and JUVÉDERM and

24 maybe Restylane.

25            THE COURT:  But it strikes me that we're shifting

1  ground here.  Your brief raises two points with regard to the

2  scope.  First of all -- and you've inquired as to this -- your

3  first argument is that the search warrant was without any time

4  or date limit and was overbroad and must be suppressed.  The

5  second argument was that the seizure of 1282 patient records

6  grossly exceeded the terms of the warrant and was the result of

7  an unconstitutionally overbroad warrant.  Now you seem to be

8  arguing to me that he didn't search as broadly as he should

9  have.

10       The objection's sustained.

11  Q.    (BY MR. LYONS)  Did you indicate in your search warrant

12  affidavit that part of the reason for the misbranded drug

13  definition that you were searching for evidence of was the fact

14  that Mrs. Sanders lost her nursing license in September 2016?

15  Was that one of the allegations?

16  A.    I think we put that in as an informative thing that had

17  occurred in this timeline.

18  Q.    But that, in fact, defines the crime of misbranded drugs

19  if she's unlicensed and she's injecting drugs without proper

20  supervision; correct?  I mean, that's a definitional phrase.

21  A.    Correct.

22  Q.    Okay.  Did you limit the search of computer records or

23  patient records or any files or records whatsoever to the time

24  after she lost her license?

25  A.    No.

1    Q.    All right.

2              MR. LYONS:  I don't have anything further.

3              THE COURT:  Mr. Proctor.

4              MR. PROCTOR:  We have no redirect, Your Honor.

5              THE COURT:  You may step down, sir.

6         The defendant may call her next witness.

7              MR. LYONS:  No further witnesses, Your Honor.

8              THE COURT:  Very well.  Let's excuse the other

9    witnesses so they can go about their business.

10             MR. PROCTOR:  Thank you, Your Honor.

11             THE COURT:  And with that, Mr. Lyons, any further

12   argument?  Well, let me ask:  I take it there's no rebuttal

13   witnesses; correct?

14             MR. PROCTOR:  There are none, Your Honor.

15             THE COURT:  All right.  Mr. Lyons.

16             MR. LYONS:  Based on the number and the various

17   cases that I cited, Your Honor, in my motion to quash, I

18   certainly take the position, based on the case law, that

19   attachment B that has the language to search for evidence,

20   fruits, and instrumentalities of violations of federal law,

21   including, but not limited to, violations of 21 U.S.C. 331

22   makes that just on its face an impermissibly overbroad warrant.

23        Frankly, it appears to me that the case law on that is

24   absolutely clear, that that kind of broad language doesn't

25   provide any limitations on the scope of the search.  As we

heard from the testimony of the agents in here -- I believe it

was Agent Blair, I believe it was, who said, I didn't have any

clue what I was searching for, nobody gave me any instructions

or directions.  He later said he had seen Exhibit B but he

said, look, I just searched through every patient file that I

could and when I -- you know, when I found what I was looking

for, which was BOTOX or -- he may have said JUVÉDERM or

fillers -- then, you know, bingo, he found a file to then

required them to search further.

I mean, they didn't even have evidence of a crime based

on their searches that they found there.  So they gather up

1282 files.  They take them back.  And then based on Agent

Bain's testimony is what they did is they went through about a

hundred of the files -- excuse me.  They sent out letters, a

thousand letters, to all these people soliciting information

about, well, did you have a bad result, tell us about what

happened, whatever.  Got about a hundred responses and then

it's boiled down to about ten or twelve patients now for which

there are charges.  I take that back.  There's probably seven

or eight parents for which there are charges now.

Which my understanding of search and seizure law is the

crime has got to be obvious from the evidence you seize there

at that time.  You don't get to, let's see, let's take in all

the records or let's take in, you know, 25 percent of the

records, and then let's synthesize them down and let's boil

1  them down, let's contact some people, let's do this, this and

2  that.  Because at that point then, it's my belief that this is

3  absolutely a general search because they have no idea what

4  they're looking for in these records but they're going to grab

5  up everything that looks at least close as to BOTOX, JUVÉDERM,

6  and Restylane, and then they're going to come back and they're

7  going to send letters back to people without date and times --

8  excuse me -- without date limitations, without time

9  limitations, without any limitation at all.

10         Certainly there's no evidence from the government that

11  in the computer searches there were any limitations.  And they

12  took every hard drive from any computer there, copied all of

13  those, and sent out letters to the patients, you know, trying

14  to figure out if there were problems and then that's what

15  generated the indictment in this case.

16         And I get it that the times that a judge has the

17  ability to throw out an indictment or find that the Grand Jury

18  process has been abused is pretty limited.  But in this

19  particular case where -- I mean, a couple of the agents didn't

20  even know what fruits and instrumentalities of crimes are but

21  yet they're sitting out there searching for it.  You can see

22  them gesturing with their hands, well, I don't know, it's a

23  container, it's -- there's something somewhere that when I see

24  it I know it.

25         You know, that just doesn't strike me as what the

1  Founding Fathers indicated when they said if you're going to do

2  a search, it better particularly describe the items to be

3  searched for and the things to be seized so that when somebody

4  looking at this warrant and is about to execute it knows what

5  they find, because it's set forth in the document, then the

6  search is over.

7          In this particular case, they searched every patient

8  file -- yes, sir.

9          THE COURT:  Are you contending that there was

10  anything seized, other than patient records, that exceeded the

11  scope of the search warrant?

12          Just that first narrow question, other than patient

13  records --

14          MR. LYONS:  Yes, sir.

15          THE COURT:  -- are you saying that they seized

16  anything, other than patient records, that exceeded the scope

17  of the warrant?  I mean, a number of your questions went to

18  that, vehicles, you know, etcetera, etcetera.

19          MR. LYONS:  In my estimation, the seizing of the

20  computer hard drives without any limitation on it whatsoever,

21  and it was just, here, take every computer hard drive that

22  there is, without any search terms, without any limitations on

23  the time searched, without any of that, that that exceeds the

24  scope of a properly authorized warrant.

25          THE COURT:  Okay.  That argument does interest me.

1 But as to not only that, but also the patient records, I mean,

2 as I looked at this thing, 1282 patient files, that got my

3 attention.  But now I understand that their explanation was,

4 well, we have to then match those up with the batch numbers, or

5 whatever they call them, to see where the BOTOX was sent.  Once

6 again, you've got BOTOX and then you've got JUVÉDERM 3 and 4,

7 which is a different category.

8          The cases do seem to allow seizure of more than

9 specific items that appear to be obvious evidence of a crime at

10 the time of seizure as long as they're reasonably connected to

11 the investigation.  In other words, if, in fact, they had to

12 take those patient records and then look to see whether or not

13 the BOTOX was the BOTOX that was sent to Asia, India, wherever,

14 that appears to be something that the courts have allowed.

15          As to the computer records, how would you limit a

16 search of computers in terms of subject matter?  This search

17 took, by the testimony today, about five hours.  If they were

18 to go through and try to pick out only that which applied to

19 these types of violations of misbranded drugs, it would take

20 them a week, wouldn't it, to go through all the computer

21 records?  They'd be there at the store front trying to pick

22 through and determine what specific records pertain to what

23 they contend was misbranded drugs, wouldn't they?

24          **MR. LYONS:**  It possibly could.  But here's -- let me

25 answer your first question first.

1      *U.S. v. Medlin,* Arvle Medlin, was exactly like this.

2   They went out on a search warrant for stolen property,

3   specifically listed items.  They started looking around.

4   There's lawnmowers.  There's all these guns.  There's all

5   this.  They grab everything up and take it back to their

6   office, then run the serial numbers, then do the stolen

7   property reports, then check around with people to find a bunch

8   of this other stuff was stolen when it wasn't specifically

9   listed in the search warrant.  My reading of that case says,

10  you don't get to snag everything and take it back with you and

11  figure out later whether it's stolen or not.

12      And my recollection also is that there's a case of

13  *Edwards v. Arizona*, the Supreme Court case, where the police

14  officers in -- I can't remember -- Phoenix or wherever go in,

15  look at a television, find the serial number on it, write down

16  the serial number, take it back to the office, figure out it

17  was stolen, and then go back.  They weren't authorized to

18  search for that serial number.

19      So look at it now and then figure out later whether

20  it's a crime or not I don't think is authorized.

21      **THE COURT:**  Well, so you're saying that the only way

22  this search could have been done was to go in and look for

23  particular patient files?

24      **MR. LYONS:**  Right.  They had evidence of eight

25  patients for which they believed there was a crime, and that's

1    set out in paragraphs 48 to 94.  They didn't have any evidence

2    whatsoever of anybody else for any other crime.  Thank you,

3    Judge.  That's exactly the point.  They went in and just said,

4    we're going to seize every patient record we find, then we'll

5    figure out later whether we think there's a crime here.

6           **THE COURT:**  Three felonies a day.

7           **MR. LYONS:**  That's right.

8           **THE COURT:**  Right.

9           **MR. LYONS:**  And I hate to say it's the

10   shoot-first-ask-questions-later kind of scenario, but that's

11   what it is.  They just grabbed everything.

12          And so if they were doing a computer search, their

13   expert should have been they're saying, here are the search

14   terms that we're going to look at their computers and drag this

15   information off.  We're at least going to do a date,

16   September 2016 and thereafter, because that's what they're

17   claiming is one of the seminal factors here for this misbranded

18   drug is because Ms. Sanders had her RN license suspended.

19          **THE COURT:**  Except that was the date that it was

20   suspended.  Even the nursing board was looking back to a date

21   prior to September 21st of 2016 as the basis for the

22   suspension; correct?

23          **MR. LYONS:**  But that was only -- there was one time,

24   as I recall, for an incident in 2014.  And, quite frankly, I

25   haven't -- I haven't, you know, parsed through those -- through

1    those items specifically.  But my recollection -- let me see if

2    I can find it here real quickly without -- without being too

3    wildly incorrect.

4                    *(Discussion held off the record)*

5            **MR. LYONS:**  I'm looking at my associate, Judge.  I

6    mean, what I recall the general overview is that

7    September 21st, 2016, she lost her nursing license.  Paragraph

8    44 says on September 22nd, 2016, FDA agents interviewed her and

9    told her that the purchasing of unapproved drugs was illegal.

10   There isn't any other event or incident for unapproved drugs,

11   or certainly not misbranded BOTOX, as defined by improper

12   labeling, improper packaging, improper package insert, that

13   kind of stuff.  There's no indication from that as far as I

14   know.  So you've got this big -- oh, here it is.  No, I'm

15   sorry.  I missed it.

16           So my belief is that there's this huge time gap that

17   they can't go back to 2014 or '13 on this kind of stuff.  I

18   think the discrete event is the 2015 trash-pull followed by

19   September 2016 Ms. Sanders first lost her license, followed by

20   September 2016 FDA agents told her she was using unapproved

21   drugs because they weren't coming from the right place, and

22   then there's no evidence past that ever, ever of her buying

23   unapproved drugs.  In fact, when they did the two trash-pulls

24   in January and February of 2018, they found all the drugs were

25   fine.

1        And so my point is that whatever they may have been

2   looking for for the unapproved labeling -- wrong country, wrong

3   distributor evidence of a misbranded drug -- ended in 2016.

4   Their search in 2018, according to the warrant, was a

5   misbranded drug because Ms. Sanders wasn't properly licensed

6   and there wasn't enough, you know, physician supervision.

7   Which, quite frankly, Judge, is such a nebulous term that I

8   don't know -- I disagree that there should have been a search

9   warrant issued for such a nebulous issue, but you've already

10  ruled on that so I'm not bringing that back up again.

11            THE COURT:  All right.  Anything else?

12            MR. LYONS:  Yes, Judge.  And interestingly, what I

13  heard Bain and the other agents talk about is they looked in

14  the files and they had to do not just a cursory review.  We did

15  hear somebody -- and I don't remember who it was -- briefly

16  say, well, we could kind of find maybe in some files there was

17  an immediate mention of BOTOX.  But I think the essence of what

18  they all testified to was they had to -- they had to read the

19  patient files in-depth and records, they had to see the facial

20  outlines, they had to look then to see, well, is there -- was

21  there BOTOX or JUVÉDERM injected, then they had to look further

22  down for these lot numbers of the drugs.  If the lot numbers of

23  the drugs indicated the drugs came from overseas or some

24  unapproved source, we didn't hear any testimony about that.  We

25  didn't hear one iota of testimony about that.

1    Instead, here comes an indictment for causing harm to

2  these people by committing fraud, specific-intent mail fraud --

3  or wire fraud actually is the vast majority of them because

4  Ms. Sanders didn't tell them she wasn't licensed.  If they were

5  looking for this evidence of misbranded drugs for the lot

6  numbers, where's that evidence?  It isn't anywhere.

7    In my estimation, this is a total sham, at least based

8  on what the affidavit and the search warrant were issued for

9  versus what they searched for and then what the charges are.

10  That's the sum and substance of it, Judge.

11    **THE COURT:**  Mr. Proctor.

12    **MR. LYONS:**  Thank you.

13    **THE COURT:**  Thank you.

14    **MR. PROCTOR:**  Your Honor, this investigation, this

15  prosecution, and this search are the opposite of a sham.

16  They're very professionally done, operations designed to get at

17  a complex crime that is wrapped up in a complicated regulatory

18  scheme.

19    So just to begin with what's at issue here, Your Honor,

20  and not to revisit what you've already ruled on as far as the

21  sufficiency of the warrant, as well as the particularity of the

22  attachment B and the other documents, these agents in a short

23  period of time in a way designed to reduce the amount of

24  disruption to an ongoing business venture worked diligently for

25  one day to go through thousands and thousands of medical

1  records to identify ones that fell within the ambit of the

2  search warrant.  I think the very fact that a limited number of

3  agents had to go through thousands and thousands of these in

4  the course of a few hours shows that it could not have been

5  anything more than a cursory search.

6        **THE COURT:**  So, what, seven agents; is that correct?

7        **MR. PROCTOR:**  I may be -- it's in that vicinity,

8  Your Honor.  I would have to go back and count to make sure who

9  was involved in the actual records search versus the interviews

10  versus security.

11        **THE COURT:**  While it's on my mind, how do you

12  respond to Mr. Lyons' argument that -- he didn't use this

13  term -- but it was a fishing expedition and that you should

14  properly have been limited to search for evidence of the eight

15  individuals that are set forth in, what, paragraphs 48 through

16  94 of the affidavit?

17        **MR. PROCTOR:**  Your Honor, I think that the affidavit

18  lays out what is -- what ultimately is a scheme.  It is an

19  operation that is consistently doing this.  The fact that there

20  were several folks spread out by -- I believe in the warrant on

21  page 16 it says starting around 2012 up through the time of the

22  warrant, it is not an unreasonable inference from a continuous

23  operation working with at least eight people who actually

24  volunteered to come forward and talk about it that it's

25  broader, that there was something else going on within this

1    organization that needed to be checked out.

2         And so much like one might enter a cell phone or some

3    other searched item, they isolate it down as much as they could

4    in the time they had balancing a disruption of the business

5    with collection of evidence that might later be destroyed,

6    easily transportable, potentially vulnerable evidence, they

7    pull that out and then they took what I think is a pretty

8    convincing next step to narrow it down even further, which is

9    to reach out for potential victims of this so that if it does

10   turn out -- I don't think any of these crimes are victimless.

11   But if you narrow down to those victims who are interested in

12   finding out that they were given something that is misbranded;

13   that is, either given because it's outside the FDA's supply

14   chain or given without proper doctor prescriptions, that they'd

15   be interested in seeing what they could do about it.  So then

16   they narrowed it down to a small, small subset of the total

17   number that then got boiled down further to make a digestible

18   indictment that we could then use to pursue charges.  So it

19   just strikes me as the proper way to carry out a proper

20   warrant.

21        And, again, I think Mr. Lyons -- sorry -- I think

22   Ms. Sanders has hinted out how much broader this could be.  And

23   as Your Honor ruled, there was a missing comma, but the good

24   faith of those agents is further shown by the fact that they

25   did not try to go beyond the sorts of drugs described in the

1   search warrant.  Perhaps there were other drugs, but the search

2   warrant focused on BOTOX, JUVÉDERM, and Restylane and they were

3   looking for BOTOX, JUVÉDERM, and Restylane.  And so I don't

4   think that there was in any way an expansion beyond the terms

5   of the warrant.

6           And, Your Honor, if I may just quickly address the time

7   frame issue.  Again, the allegations in the warrant on page 16

8   go back to E.H., I believe it's paragraph 74, all the way back

9   to when she started receiving BOTOX treatment in 2012.  There's

10  a discussion of the sort of cursory interaction with the doctor

11  that would lead someone to suspect that there was not a valid

12  prescription given for injectable fillers and basically the

13  extract of botulism.  So there is a long period of time showing

14  that this has being gone on for at least six years.

15          So there is no requirement in the case law to

16  necessarily have a time limit.  Is it an indicator?  Yes.  But

17  when you have an ongoing scheme that has been doing this

18  potentially for years, it's not something that is required in

19  order to make this a sufficiently particular warrant that then

20  is executed in a good faith fashion.

21          And finally, Your Honor, you mentioned the computers

22  earlier and I -- because the motion to quash in its section on

23  the scope focused, I think, entirely on the patient files -- I

24  believe our computer expert is in DesMoines -- is that right?

25  -- in DesMoines is not here.  However, we don't discriminately

1    search through computers.  We image the document and then the

2    forensic team uses their own strategies to go in there and find

3    out what is relevant.

4            The case law -- I would hesitate to name cases in

5    particular, but that is an accepted way to get into computers

6    so that they're not destroyed in the interim and they don't

7    take an excessive amount of time to search on-site to honor the

8    limits of the Fourth Amendment.

9            **THE COURT:**  A couple questions.

10           **MR. PROCTOR:**  Yes, sir.

11           **THE COURT:**  You say the search warrant focused on

12   BOTOX, JUVÉDERM, and Restylane.  I don't see any of those words

13   in the search warrant.

14           **MR. PROCTOR:**  Can you just give me one moment, Your

15   Honor?

16           **THE COURT:**  Yes, sir.

17           **MR. PROCTOR:**  I apologize, Your Honor.  If I said

18   the warrant, I meant the affidavit as part of the overall

19   warrant application.  BOTOX is mentioned on page 4, paragraph

20   15, it mentions BOTOX and Dysport.  And if I spoke out of turn

21   about JUVÉDERM and Restylane, I would have to --

22           **THE COURT:**  All right.

23           **MR. PROCTOR:**  -- double-check real quick; however,

24   it certainly mentions BOTOX in that paragraph.

25           But it also -- but perhaps more generally, if I

1    misspoke by saying JUVÉDERM or Restylane, it certainly focuses

2    in on misbranded devices, which I think in the context of this

3    warrant and the spa's business would have meant fillers such as

4    JUVÉDERM and Restylane.

5    **THE COURT:** Count 1 alleges a crime on or about

6    January 14th, 2015, regarding BOTOX Cosmetic which was shipped

7    from Mumbai, India, for the purported personal use by Sanders.

8    That evidence, is that coming from a search of the computers or

9    is that coming from the trash-pull as to which you've not

10    retained any of the boxes?

11    **MR. PROCTOR:** I would have to double-check, Your

12    Honor. I do know that the -- if I may consult with counsel

13    quickly?

14    **THE COURT:** You may.

15    *(Discussion held off the record)*

16    **MR. PROCTOR:** Your Honor, I just learned from my

17    co-counsel that it was after the execution of the warrant and

18    one of the doctors turned I think it was a Mumbai folder over

19    to investigators in a separate incident that laid out that

20    there was drugs coming in from India.

21    **THE COURT:** All right. So that was not the result

22    of this search warrant at all?

23    **MR. PROCTOR:** No, Your Honor.

24    **THE COURT:** All right.

25    **MR. LYONS:** May I ask a point of clarification on

1   that, Your Honor?

2               **THE COURT:**   A little more discovery, Mr. Lyons?

3               **MR. LYONS:**   Well --

4               **THE COURT:**   Go ahead.

5               **MR. LYONS:**   -- I'd like the government to admit that

6   was a patient file of Kaye Sanders that was taken by the

7   government without any HIPAA release.  I'd like to know how

8   they're going to get over that issue.

9               **THE COURT:**   Well, that's an issue separate and

10  apart, I believe, from the issues that are set out today.  So

11  we'll sure take that up as it comes but I think it's outside

12  the scope of today's hearing.

13          All right.  Mr. Proctor, anything further?

14              **MR. PROCTOR:**   No, Your Honor, I don't believe so.

15              **THE COURT:**   Okay.  Thank you very much.

16              **MR. PROCTOR:**   Thank you, Your Honor.

17              **THE COURT:**   And reply?

18              **MR. LYONS:**   Well, I'm going to gently say it, but I

19  told you so.  They're bringing in this supply chain argument

20  that has nothing to do with the search warrant affidavit and it

21  has nothing to do with the execution of the search warrant.

22  Because what they're going to try to claim is now all drugs at

23  various places were bought from unapproved sources and they're

24  going to try to bring in all these arguments that anything

25  purchased outside the Allergan supply chain, because you've got

1  unauthorized dealers, is somehow a crime.  That's going to be

2  -- that's going to be all over the face of the evidence of this

3  case when they come in here, and it has nothing to do with the

4  crimes as they are alleged, it has nothing to do with the

5  search warrant affidavit, it has nothing to do with the search

6  warrant.  As we all know, the search warrant itself is a

7  standalone document, the affidavit isn't incorporated into it.

8  So --

9  THE COURT:  Well, the superseding indictment alleges

10  both the use of these fillers -- JUVÉDERM, BOTOX, etcetera --

11  from unauthorized sources as well as BOTOX and other fillers

12  administered without the supervision of a licensed

13  practitioner; correct?

14  MR. LYONS:  But what does that have to do with wire

15  fraud?  I mean, that's the point, Judge, there's no connection

16  whatsoever.  If the allegation is that --

17  THE COURT:  Well, once again, you're getting into --

18  MR. LYONS:  And I apologize.

19  THE COURT:  -- the argument that -- I went back and

20  read the portion of my order citing the U.S. Supreme Court

21  decision.  With all due respect, I think that's beyond the

22  issue before the court today on scope of the search.  So

23  anything else?

24  MR. LYONS:  No.  But thank you.

25  THE COURT:  All right.  Thank you.

1          *(Discussion held off the record)*

2                **THE COURT:**  So it's clear that we need to issue a

3     written order here.  This matter stands submitted for a final

4     written decision and we thank you very much.  Oh, just one

5     second.

6          *(Discussion held off the record)*

7                **THE COURT:**  The court will return the exhibit book

8     to counsel.

9          *(Discussion held off the record)*

10               **DEPUTY COURT CLERK:**  For the pretrial date, July 6th

11    at 9:30, a Monday morning.

12               **MR. PROCTOR:**  We'll have someone here, Your Honor.

13               **THE COURT:**  I need the attorneys who are going to

14    try the case here.

15               **MR. PROCTOR:**  Oh, we will be here, Your Honor.

16               **THE COURT:**  Okay.

17               **MS. COZZONI:**  Does that mean if we make somebody

18    else come, they have to try it?

19               **THE COURT:**  Exactly.  No, that's exactly right.  So

20    if there's anybody in the U.S. Attorney's Office you really

21    want to punish.

22          And you'll be back, Mr. Lyons; correct?

23               **MR. LYONS:**  Yes, sir.  I'm sitting here hesitating

24    slightly.  Boy, I sure have it in my mind that I've got a

25    conflict on the 6th, but my associate who has a far better

1   memory of that says I'm wrong.  So apparently July 6th at 9:30
2   will be fine.
3               **THE COURT:**  All right.  Well, obviously if you all
4   have previously established obligations, then let us know just
5   as soon as possible and we'll bump it.
6               **MR. LYONS:**  Okay.  We will.
7               **THE COURT:**  All right.  Thank you very much.  We are
8   adjourned.
9                    *(The proceedings were concluded)*
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1

*C E R T I F I C A T E*

2

3

4          I, Brian P. Neil, a Certified Court Reporter for the

5     Northern District of Oklahoma, do hereby certify that the

6     foregoing is a true and accurate transcription of my

7     stenographic notes and is a true record of the proceedings held

8     in above-captioned case.

9

10          I further certify that I am not employed by or related

11    to any party to this action by blood or marriage and that I am

12    in no way interested in the outcome of this matter.

13

14          In witness whereof, I have hereunto set my hand this

15    29th day of June 2020.

16

17                                   s/ Brian P. Neil

18                          _____

19                              *Brian P. Neil, RMR-CRR*
                                *United States Court Reporter*

20

21

22

23

24

25